TH INVESTMENTS, INC., Appellant,

v.

KIRBY INLAND MARINE, L.P. and Port of Houston Authority of Harris County, Texas, Appellees.

No. 14–05–00204–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 1, 2007.

Andrew Lovell Strong, Arthur L. Schechter, David E. Harrell, John L. Hill, Roland Garcia Jr., Houston, and Michael V. Powell, Dallas, for appellants.

Catherine B. Smith, Daniel V. Flatten, David H. Brown, James S. Barrick, John James Michael, Mark E. Lowes, and Murry B. Cohen, Houston, for appellees.

Panel consists of Justices HUDSON, FOWLER, and SEYMORE.

## CORRECTED OPINION

WANDA McKEE FOWLER, Justice.

We originally issued our opinion affirming the trial court's judgment on January 9, 2007. On Kirby Inland Marine, L.P.,'s unopposed motion to correct the opinion, we withdraw our previous opinion and substitute this corrected opinion in its place.[1]

This appeal by a private landowner, TH Investments ("THI") against the Port of Houston Authority and Kirby Inland Marine, asks us to decide who owns two tracts of property on the Old River and the San Jacinto River. As will be discussed in greater detail below, both rivers are subject to the tides. Three broad issues—and many sub-issues—are presented.

The first two issues pertain to the first tract, Tract 1. We first must determine whether the State has gained ownership of it because the property is covered by shallow tidal waters. Second, we are asked to decide if the location the trial court chose for the southern boundary of Tract 1 coincides with the boundary set by the original 1838 survey of the property. The third issue involves Tract 2. We are asked to decide whether THI owns Tract 2. In the body of the opinion we will address the many sub-issues, but for purposes of this overview, we hold the following regarding the three broad issues. First, the State did gain ownership of Tract 1 because it became submerged as a result of indistinguishable effects of erosion and subsidence. Therefore, the trial court correctly ruled that the Port owns Tract 1. Second, the southern boundary set by the trial court for Tract 1 is the same as boundary set by the original 1838 survey. Third, as the trial court held, THI does not own Tract 2. In short, we affirm the trial court's rulings.

### Factual and Procedural Background

The property lies near the confluence of the Old River and the San Jacinto River, east of Houston near Channelview, in Harris County, Texas. Tract 1, which historically consisted of 27 acres, is now a "flat," almost completely submerged beneath the waters of the two rivers.[2] Occasionally,

---

1. We correct the opinion to clarify our description of the trial court's disposition of Kirby's motion for summary judgment in footnote 35.

2. The trial court's Finding of Fact No. 3, which is unchallenged, specifically states that Tract 1 "lies in Harris County, east of the City of Houston, north of the confluence of the

Tract 1 becomes exposed during the fall and winter months during low tide when a north wind blows. Tract 2 is a small parcel of land to the east consisting of 6.1 acres variously described as an island or a strip of riverbank. The two tracts are sometimes identified by their acreage as "the 27 Acre Tract" and "the 6.1 Acre Tract." The area around the property is subject to significant commercial maritime use, as well as occasional use for recreational purposes by pleasure craft and for fishing.

What follows are the relevant facts framing the dispute; more specific details are developed in the discussion of the issues.

### THI's Purchase of the Property

In November 2002, THI acquired record title to Tract 1 by a non-warranty deed from the record owners, known collectively as the "Carter Heirs," and acquired Tract 2 by quitclaim deed from the Carter Heirs. The contract of sale for Tract 1 included an "Addendum for Coastal Area Property," which provided to THI the following notice:

### NOTICE REGARDING COASTAL AREA PROPERTY

1. **The real property described in and subject to this contract adjoins and shares a common boundary with the tidally influenced submerged lands of the state.** The boundary is subject to change and can be determined accurately only by a survey on the ground made by a licensed state land surveyor in accordance with the origi-

nal grant from the sovereign. **The owner of the property described in this contract may gain or lose portions of the tract because of changes in the boundary.**

\* \* \*

3. **State law prohibits the use, encumbrance, construction, or placing of any structure in, on, or over state-owned submerged lands below the applicable tide line,** without proper permission.

4. **The purchaser or grantee is hereby advised to seek the advice of an attorney or other qualified person as to the legal nature and effect of the facts set forth in this notice** on the property described in and subject to this contract. Information regarding the location of the applicable tide line as to the property described in and subject to this contract may be obtained from the surveying division of the General Land Office in Austin.

(emphasis added). When he signed the contract for sale, THI's president, Earl Thrift, neither read the deeds himself nor engaged counsel to do so.

When THI purchased the land from the Carter Heirs in 2002, the Carter Heirs also assigned to THI a lease with Kirby Inland Marine, L.P. THI, which intended to start its own barge fleeting business, then informed Kirby that it would either have to vacate the area and remove any improvements made or start paying $35,000 monthly in rent.[3] When Kirby did not agree to THI's demands, THI termi-

---

Houston Ship Channel and the San Jacinto River, south of Interstate 10, and in the area of confluence of the San Jacinto River (to the east and south of the property) and Old River (to the north and west of the property)."

3. Since 1978, Kirby, or its predecessor, Western Towing Co., had leased Tract 1 from the Carter Heirs to conduct its barge mooring and fleeting business adjacent to the property. From 1978 until 1991, the Carter Heirs charged $500 a month for the lease, and in 1991 increased it to $1,000 a month.

nated the lease and threatened to evict Kirby.

**The Lawsuit**

As a result of THI's actions, Kirby filed suit against THI to enjoin it from interfering with Kirby's business operations and to obtain a declaratory judgment that the State of Texas—not THI—owned Tract 1.[4] Kirby later joined the Port, asserting that the State conveyed ownership of the property to the Port by statute.[5] Eventually, the posture of the case evolved into, primarily, an action by THI on its counterclaims and cross-claims for trespass to try title to Tract 1 and Tract 2. THI claimed record title to both tracts, and Kirby claimed ownership of Tract 2. The Port claimed that it owned any part of Tract 1 or 2 that was below mean high tide or was raised above mean high tide by artificial means or "self-help."

The trial court tried the issues in two phases. Phase 1 was a bench trial with THI as plaintiff on its trespass to try title action involving Tract 1; the parties presented evidence on the ownership and boundaries of the tract. The trial court heard two weeks of evidence from numerous witnesses and received many exhibits into evidence. At the conclusion of the trial, the court entered detailed findings of fact and conclusions of law. It found that THI never owned Tract 1 and that ownership of Tract 1 passed to the Port, as successor to the State of Texas, because the tract became submerged below the line of mean high tide. The court also set the southern boundary for Tract 1.

Following the bench trial, Phase 2 proceeded on Tract 2. The court considered the parties' cross-motions for summary judgment as to ownership of the tract. The court granted the Port's and Kirby's motions for summary judgment on THI's claim of record title to Tract 2, denying THI's claim of ownership. The trial court did not determine who owned Tract 2; it held only that THI did not own it.

At the conclusion of phase 2, the trial court signed a final judgment incorporating its earlier orders and attaching as an exhibit its findings of fact and conclusions of law entered after Phase 1. This appeal followed.

**I. Part 1: Ownership of Tract 1**

We turn now to the first general area of contention, the ownership of Tract 1. In Part 1 of its brief, THI claims that it, not the Port, owns Tract 1 because this case falls within an exception to the general rule that the State owns all property covered by tide waters. This claim is based on two concepts it argues apply here and on several allegedly erroneous findings of fact the trial court entered. The two concepts are that (1) private owners can own property under tide waters, and (2) if the property is submerged under tide waters because of subsidence, the general rule that the state owns submerged lands does not apply.

THI interweaves these two concepts throughout six issues:

(1) the trial court erred by holding that THI lost its riparian land to the Port as the land subsided and most of it

---

4. The trial court granted a temporary restraining order prohibiting THI from interfering with Kirby's use and possession, and the parties later agreed to a temporary injunction pending trial.

5. Kirby joined both the Port and the General Land Office of the State of Texas ("GLO").

However, the trial court later granted the GLO's plea to the jurisdiction and motion to dismiss, in which it argued in part that the State had no interest in the property at issue because the property was conveyed to the Port by statute.

became shallowly submerged beneath the waters of the Old River;

(2) the trial court erred by not following *Coastal Industrial Water Authority v. York*, 532 S.W.[2d] 949 (Tex.1979);

(3) the trial court's ruling constitutes a taking in violation of the Texas and United States Constitutions;

(4) no evidence or insufficient evidence supports the trial court's finding reciting that the extent to which subsidence versus erosion contributed to the submergence of Tract 1 cannot be determined, or alternatively, the trial court misplaced the burden of proof and applied incorrect legal standards;

(5) no evidence or insufficient evidence supports the trial court's findings that a boundary of Tract 1 described as "the meanders of Old River" cannot now be identified or located, and that the tract cannot be distinguished from the bed of Old River, or alternatively, the trial court applied the wrong standard; and

(6) no evidence or insufficient evidence supports the trial court's findings that the entirety of Tract 1 became submerged at some time in the past and that the portions of the tract that now lie above mean high water re-emerged as the result of the deposit of dredge spoils by Kirby and its predecessor, Western Towing.

Before we address THI's specific issues and the two concepts underlying them, we will review generally the law that applies to riparian and littoral owners.[6]

## A. Tract 1 is Under Tidal Waters which Typically are Owned by the State.

### 1. The State Presumptively Owns Lands Lying under Tidal Waters.

Generally, "[t]he soil covered by the bays, inlets, and arms of the Gulf of Mexico within tidewater limits belongs to the State, and constitutes public property that is held in trust for the use and benefit of all the people." *Lorino v. Crawford Packing*, 142 Tex. 51, 175 S.W.2d 410, 413 (1943). Section 11.012(c) of the Texas Natural Resources Code echoes the *Lorino* holding: "The State of Texas owns the water and the beds and shores of the Gulf of Mexico and the arms of the Gulf of Mexico within the boundaries provided in this section, including all land which is covered by the Gulf of Mexico and the arms of the Gulf of Mexico either at low tide or high tide." TEX. NAT. RES.CODE § 11.012(c). "[N]avigable waters and streams[7] are reserved to the State for the use of the public generally, and no one should have an exclusive right to the enjoyment of such property, unless and until the Legislature has granted such right." *Lorino*, 175 S.W.2d at 414. Thus, two presumptions arise regarding submerged lands: (1) they are owned by the State and

---

6. The term "riparian" means "belonging or relating to the bank of a river or stream." *Brainard v. State*, 12 S.W.3d 6, 15 n. 2 (Tex. 1999). A "riparian owner" is one whose land is bounded by a river. *Id.* The term "littoral" means "belonging to the shore," and a "littoral owner" is one whose land borders an ocean, sea, or lake. *Id.* at 21 n. 7.

7. "Navigable waters" are defined broadly in Texas and they include waters within the tidewater limits of the Gulf of Mexico and

streams that are navigable in law or fact. *See State v. Bradford*, 121 Tex. 515, 50 S.W.2d 1065, 1069 ("navigable waters" includes "navigable streams, as defined by statute, lakes, bays, inlets, and other areas within tidewater limits within its borders"); *Lorino*, 175 S.W.2d at 413 ("The bays inlets, and other waters along the Gulf Coast which are subject to the ebb and flow of the tide of the Gulf of Mexico are defined as 'navigable waters.' ").

(2) the State has not acted to divest itself of title to them. *See, e.g., Lorino,* 175 S.W.2d at 414; *City of Galveston v. Mann,* 135 Tex. 319, 143 S.W.2d 1028, 1033 (1940); *State v. Bradford,* 121 Tex. 515, 50 S.W.2d 1065, 1069 (1932); *Landry v. Robison,* 110 Tex. 295, 219 S.W. 819, 820 (1920); *City of Galveston v. Menard,* 23 Tex. 349, 392 (1859).

 Addressing these presumptions, the *Lorino* court explained that "land under navigable waters is withdrawn from the general provisions of the statutes conferring upon the Land Commissioner the right to contract for the sale or lease thereof." *Lorino,* 175 S.W.2d at 413. Instead, only the Texas Legislature may convey submerged tidal lands. *See id.* at 414. The Court explained the reason for this rule as follows:

> It has always been the policy of the State to dispose of ordinary public lands to settlers, and under usual circumstances it may be presumed that the State has parted with title; but navigable waters and streams are reserved to the State for the use of the public generally, and no one should have an exclusive right to the enjoyment of such property, unless and until the Legislature has granted such right. Therefore, it has been the policy of the State to retain

title to lands covered by navigable waters, and the presumption is that there has not been any act of the State divesting itself of title.

*Id.* at 414 (citing *Bradford,* 50 S.W.2d at 1069).

The public policy that informs the presumption of State ownership is also reflected in the Texas Legislature's 1927 conveyance to the Port's predecessor, a political subdivision of the State. The Legislature conveyed to the Port's predecessor all of the submerged lands "as now or hereafter located" in the areas presently at issue, including those lands submerged beneath the waters of the Old River and the San Jacinto River. *See* Act of April 5, 1927, 40th Leg., R.S., ch. 292, 1927 Tex. Gen. Laws 437, 438. This conveyance included "all the submerged lands lying and being situated under the waters of ... San Jacinto River ... [and] ... Old River ... so far up said streams as the State may own same, together with all lands lying and being situated under the waters of Old River ... and all other tidal flats or overflow land adjacent to or appurtenant to the above mentioned streams .... as now or hereafter located...." *Id.* at 438, § 1.[8] The Legislature directed the Port to administer these lands "for public

---

8. The trial court concluded that, as Tract 1 became submerged below the line of mean high tide, ownership of that submerged property passed to the Port pursuant to Texas law and the provisions of the Act of April 5, 1927. THI contends the trial court's interpretation of the 1927 Act was in error, because its ruling that Tract 1 reverted to the State conflicts with the following language of section 4 of the Act:

> The purposes and provisions of the Act, and the grants, rights and privileges, thereunder to [Port], shall not affect, curtail or abridge the rights of riparian owners of lands abutting upon the islands and lands subject to overflow, and lands lying under the streams, bays and lakes herein described or

referred to, as the same existed under the Common Law or the Constitution or Statutes of Texas at the time this Act shall become in force and effect, or to deprive riparian owners of access to such streams, channels or waterways.

However, we do not read this section to abridge any of the general rules of riparian or littoral rights applied here. In fact, the Act did not cause THI to lose title; these well-established rules caused THI's loss. The only relevant question is the location of the line of mean high tide. The Act merely fixed the ownership of the property in the Port once the property became submerged below the line of mean high tide.

purposes and the development of commerce only" in connection with the development of the Port of Houston. *Id.* The Legislature also directed that the Port was not at any time to "give or alien said lands or any part thereof" and empowered the Port to "abate and remove any and all encroachments or structures of any kind now or hereafter existing on such property." *Id.* at 439, §§ 2, 3.

**2. Unchallenged Findings of Fact State that the Land is Under Tide Waters.**

The trial court entered a fact finding, unchallenged by THI, that the waters of Old River and the San Jacinto River are navigable.[9] Also unchallenged by THI is the trial court's finding that the land is subject to the ebb and flow of the tide, is within the tidewater limits of the Gulf of Mexico, and is tidally influenced:

> The water over, around and in the area of the 27–Acre Tract is subject to the ebb and flow of the tide, being within the tidewater limits of the Gulf of Mexico. The waters of Old River and the San Jacinto River likewise are tidally influenced in the area in question. The facts in the record demonstrate the area is tidally influenced. The parties likewise stipulated the area is tidally influenced.

**3. The Boundary between Public Submerged Tidal Lands and Private Lands Derived from a Common–Law Grant is Mean High Tide.**

■ The Texas Supreme Court long ago announced the boundary between State and private ownership of submerged tidal lands. For common law land grants, the boundary is the line of mean high tide; for Spanish or Mexican grants, it is the line of mean higher high tide. *See Luttes v. State,* 159 Tex. 500, 324 S.W.2d 167, 175 (1958) (civil law); *Rudder v. Ponder,* 156 Tex. 185, 293 S.W.2d 736, 741 (1956) (common law); *see also Kenedy Mem'l Found. v. Dewhurst,* 90 S.W.3d 268, 270 (Tex.2002) (applying rule of *Luttes* to locate shoreline boundary). Because the property at issue passed under a common law grant, the boundary line that applies here, in the absence of any exception, is the line of mean high tide.[10]

This boundary is not static. The boundary moves because the line of the tide moves over time, and as that line moves, so does the boundary between State-owned submerged lands and privately owned uplands. *See Brainard v. State,* 12 S.W.3d 6, 17 (Tex.1999) ("Texas follows the general rule that when the location of the margin or bed of a body of water that constitutes the boundary of a tract of land is gradually and imperceptibly changed or shifted by accretion, reliction, or erosion, the margin or bed of the body of water, as so changed, remains the boundary line of the tract, which is extended or restricted accordingly."); *Coastal Indus. Water Auth. v. York,* 532 S.W.2d 949, 952 (Tex. 1976) ("The general rule is that a riparian or littoral owner acquires or loses title to the land gradually or imperceptibly added or taken to or from his fast bank or shore."); *City of Port Isabel v. Mo. Pac. R. Co.,* 729 S.W.2d 939, 942 (Tex.App.-Corpus

---

9. The trial court also concluded that the waters of Old River and the San Jacinto River are navigable in law, because the waters are tidally influenced and the rivers average more than 30 feet in width from their mouths up, citing *Lorino,* 175 S.W.2d at 413, *Bradford,* 50 S.W.2d at 1069, and Texas Natural Resources Code section 21.001(3).

10. Mean high tide is measured by taking an average of all the daily highest readings over a long period. *Luttes,* 324 S.W.2d at 174. Mean high tide is the same as mean high water. *See id.*

Christi 1987, writ ref'd n.r.e.) ("[T]he location of the shoreline, wherever it may be at any given time, represents the boundary of a littoral owner's property."); *City of Corpus Christi v. Davis*, 622 S.W.2d 640, 643 (Tex.App.-Austin 1981, writ ref'd n.r.e.) ("With respect to the landward advance of the line of mean high tide, the Supreme Court has written that if the sea encroaches and the upland owner loses his land, he has no redress.") (citing *State v. Balli*, 144 Tex. 195, 190 S.W.2d 71, 100 (1944)).

■ The tide is not the only factor changing the boundary. It also can be changed by nature's forces—primarily water—that add to or subtract from a body of land. Additions to land generally are created by accretion or reliction. *Brainard*, 12 S.W.3d at 17. With accretion, land increases gradually and imperceptibly when water deposits solid material so that land once covered by water becomes dry. *Id.* Reliction occurs when previously submerged land is uncovered by permanently receding water. *Id.* Decreases in tidal lands generally are caused by erosion, which gradually and imperceptibly wears away the land. *See York*, 532 S.W.2d at 952. All of these processes may cause a riparian or littoral owner to gain or lose title to the land.[11]

### B. This Case Does Not Fall Under Any Potential Exceptions or Case Law THI Cites.

With these general legal principals in mind, we turn now to the exceptions and case law THI claims apply. THI claims this case falls within one of several exceptions that would allow it to continue to own land submerged under tide waters. First, THI refers us to at least one case in which the State has conveyed land to an individual. Second, THI relies heavily on *Coastal Industrial Water Authority v. York* and its holding that an individual owned property beneath the San Jacinto River that became submerged because of subsidence. THI also cites us to a handful of appellate court opinions it claims allowed individuals to continue owning land that became submerged.[12]

We consider these claims below. However, as we explain, we disagree that either claimed exception applies here, and, in light of *Luttes, Rudder, Lorino, Brainard,* and *Kenedy Memorial Foundation*—the seminal cases explaining the boundaries between state-owned and privately owned land—we find the cited case law either of questionable validity or distinguishable. *See Luttes v. State*, 159 Tex. 500, 324 S.W.2d 167 (1958); *Rudder v. Ponder*, 156 Tex. 185, 293 S.W.2d 736 (1956); *Lorino v. Crawford Packing*, 142 Tex. 51, 175 S.W.2d 410 (1943); *Brainard v. State*, 12 S.W.3d 6 (Tex.1999); *Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268 (Tex.2002).

### 1. Private Individuals Can Own Land Conveyed to Them by the State Even When the Land is Under Water.

*a. Submerged property conveyed by the State can be owned by a private individual if the conveyance contemplated submerged land.*

---

11. A different rule is usually applied in the case of the sudden removal or deposit of land; this rapid or perceptible change is termed "avulsion." *York*, 532 S.W.2d at 952. Generally, title does not pass by avulsion. *Id.* Nor may a landowner acquire title to accreted land by artificially building up submerged land into dry land along his shoreline. *Brai-*

nard, 12 S.W.3d at 19; *York*, 532 S.W.2d at 952.

12. THI also cited an attorney general opinion, but it was not highly relevant to the resolution of the issues before us. See Op. Tex. Att'y Gen. No. GA–0181 (2004).

186

Property conveyed by the State to an individual can remain privately owned even if it is submerged under tide waters—but only under very special circumstances in which the State manifested its intent that the private landowner continue to own the property even if submerged.

An example of a case in which the Texas Supreme Court found that a private individual owned shallowly submerged flats is *City of Galveston v. Menard*, 23 Tex. 349 (1859), involving Galveston Island, located in the tidal waters of Galveston Bay. Menard, as the original grantee of the state, claimed that he owned the submerged flats because they were sold to him through a legislative grant by the Republic of Texas in 1836 and through a patent issued in 1838. *Id.* at 391. The City claimed that the 1836 grant did not include the flats, and that they remained in republic and state ownership until a later date, when the Texas Legislature conveyed the flats to the City. *Id.*

The Court recognized the well-established common-law doctrine that an ordinary grant of land upon a bay, where the tide ebbs and flows, "does not convey the shore or any of the land of the bay covered with water." *Id.* at 396. But, based on the object of the grant, its location, and the acts of the contracting parties, the Court determined that the Legislature intended to convey the submerged flats to Menard, specifically to encourage the construction of a port of entry for commercial activities and promote the building of a city on Galveston Island. *Id.* at 398–408. Menard's rights were limited only by the

City's right to build and regulate the wharves and to open, improve, and use streets across the property out to the channel. *Id.* at 408.

 b. *Tract 1 was dry land when conveyed by the State.*

This appeal does not involve a conveyance like *Menard.* Although THI attempts to overcome the presumption of state ownership by showing that the Republic of Texas patented Tract 1 and other property into private ownership in 1845, the only land that THI's predecessors received from the patent was a grant of dry land. THI does not contend that the State granted to its predecessors any submerged lands. Indeed, THI states in its briefing that "[i]t is undisputed that Tract 1 was dry land at the time of the ... Grant." One may not convey more than one owns, and in this case, it is undisputed that the 1845 patent did not convey any submerged property. Nor do we find any evidence that the grant contemplated ownership by an individual if the property became submerged. Therefore, the patent does not overcome the presumption of state ownership. *See Lorino*, 175 S.W.2d at 414; *Mann*, 143 S.W.2d at 1035; *City of Port Isabel*, 729 S.W.2d at 942–43.

Thus, although private individuals can own submerged property if the State's conveyance contemplated private ownership of submerged lands, the State's patent concerning Tract 1 did not reflect an intent that it remain in private ownership if it became submerged.[13]

---

**13.** Under this section of its brief, THI also argues another exception to the presumption that the State owns submerged tidal lands by suggesting that when the water is only tidally *influenced*—not tidal—the typical cases involving land subject to tide waters do not apply. Relying on the opinion of one of its experts, THI argues that the environment of

Tract 1 is "fluvial," meaning it is dominated by the processes of river water moving downstream, rather than littoral, meaning dominated by wave or tide-induced processes, and the area is not a bay, inlet, or arm of the Gulf of Mexico. Although the Port's expert acknowledged that the area is affected by fluvial processes, he described the site as a "coastal

## 2. *York* and Any Exceptions it Creates Do Not Apply.

We now turn to THI's claim that *Coastal Industrial Water Authority v. York*, 532 S.W.2d 949 (Tex.1976), creates an exception to the general rule of state ownership of submerged lands, that *York* controls the outcome of this appeal, and that the trial court erred when it refused to apply it. We disagree and explain below that *York* is distinguishable from this case in several important respects.

### a. *Two defining and narrowing facts in York distinguish it from this appeal.*

In *York*, the Water Authority sought to condemn York's land near the San Jacinto Monument. 532 S.W.2d at 951. A survey of York's property in 1950 showed 28.083 acres above the water level, but when the Water Authority commenced condemnation in 1970, only 24.73 acres lay above water—a difference of 3.353 acres. *Id.* York's land indisputably was in an area where the land surface had been slowly subsiding during several decades because area industries and municipalities had removed enormous amounts of underground water. *Id.* As the land subsided, the adjacent waters encroached upon and submerged the land. *Id.* York argued, and the lower courts agreed, that the Water Authority should compensate York for the all of the acreage originally conveyed to him, including the 3.353 acres that had become submerged. *Id.*

As the *York* court explained, the general rule is that a riparian or littoral owner loses title to land that is worn away gradually by erosion, and gains title to land added gradually by accretion. *Id.* at 592. However, the Court distinguished subsidence from these processes, stating that subsidence is not "an ordinary hazard of riparian ownership; it is not the result of the force of the waters which takes from some owners and gives to others." *Id.* at 954. Determining that no conflict between private and public interests existed under the facts before it, the Court concluded that it was "consistent with the interests of all to permit the riparian owner to protect his land—rather than to watch helplessly as his boundary retreats." *Id.* Thus, because York's property became submerged below the water level of the Houston Ship Channel solely as a result of subsidence, the Court held that York owned the submerged land as of the date the Water Authority had sought to take York's property by condemnation. *Id.* Consequently, the Water Authority was required to compensate York for the submerged property. *See id.*

At least two courts—including the Texas Supreme Court itself—have recognized the very limited nature of the *York* holding. *See Brainard*, 12 S.W.3d at 20 ("Nonetheless, we find nothing in *York's* limited holding that precludes the operation of the rules of accretion, reliction, and erosion to artificially influenced changes in a river channel."); *Davis*, 622 S.W.2d at 643 ("Al-

---

environment," in which the waters of Old River and the San Jacinto River are brackish, tidally influenced estuaries of the Gulf. Moreover, we find no exception made in the case law for tidally influenced water and THI. The Texas Supreme Court in *Kenedy Memorial Foundation* makes it clear that only a very little movement of water suffices for tidewater cases to apply. *See* 90 S.W.3d at 280 (applying the line of the tide where "seawater inundation is regular, shallow, and somewhat

infrequent"); *see also Crary v. Port Arthur Channel & Dock Co.*, 92 Tex. 275, 47 S.W. 967, 970 (1898) (holding the phrase "waters of the gulf of Mexico" was "comprehensive" and "sufficiently broad to embrace at least all bays, inlets, and streams upon the Gulf Coast to the extent to which they are subject to the ebb and flow of the tide"). Consequently, this argument also does not overcome the general presumption.

though the [*York*] Court reaffirmed the rules with respect to property loss and gain due to erosion and accretion, those rules were not employed by the Court in its determination that the riparian owner held title to the submerged land since there was no erosion involved, only subsidence."). As we discuss, statements made by the *York* court itself limit the opinion to such a degree that it does not control our decision here, and the trial court appropriately did not apply it.

(1) *York* did not involve land covered by tidal waters.

The first, and most important, limitation of *York* is that it did not involve tide waters. The *York* court expressly stated it assumed that the tide was of no effect: "The testimony of the surveyor witnesses indicates that the level of the water upon the York land does not fluctuate with the ebb and flow of the tide, and we will *assume* that the tide has no effect at this point." *Id.* at 951 (emphasis added). In footnote 1, the court explained that the effect of the tide on the legal outcome of the case simply was not an issue raised by the parties: "The parties have not, at any point in this litigation, made any reference to the fact or legal effect of the tide. For this reason, the court's opinion is *restricted* to the issues presented by the *peculiar facts* of this record and the contentions of the parties." *Id.* at 951 n. 1 (emphasis added). Author Justice Reavley added: "The writer of this opinion, speaking personally, chooses to emphasize the *narrow-ness* of the holding and to *warn* against any misinterpretation of its effect upon the boundary of private ownership to lands within reach of the tide." *Id.* (emphasis added).[14] Although the intermediate appellate court's opinion in *York* did state that the property was subject to tide water, the Supreme Court expressly assumed no tide water covered the property. *See id.* at 951.

(2) *York* involved only subsidence and not other forces.

A second important distinction between this appeal and *York*, as we explain below, is that the *York* property was submerged due to subsidence alone. No erosion was involved. In fact, the *York* court recognized that the result could have been different if other forces, such as erosion, had affected the property. The Court noted "[i]t might be expected" that part or all of the contested acreage would have been eroded by the current of the water "so as to leave this three acre area indistinct from the bed of the ship channel." *Id.* at 951–52. Had that happened, the Court acknowledged that "ownership would have been lost to the riparian owner ... and passed to the City of Houston under the authorities to be discussed." *Id.* at 952. However, as the case was presented to the Court, "there has been no displacement of the submerged land in relation to the bed of the ship channel." *Id.*[15]

In short, the two facts that define *York*, especially for comparison with this case

14. THI dismisses this footnote. It asserts it is not a holding of the Texas Supreme Court, but only the author's personal opinion. Although that part of the footnote expressing the author's personal opinion is not a holding of the court, it is some indication of the facts the court considered important.

15. The court of appeals had applied a rule in favor of York which assumed the boundaries of the 28.083 acres were identified, and the Water Authority did not contest this issue. 532 S.W.2d at 952. Nor did the Water Authority claim any erosion of the subsided shelf. *Id.* The supreme court therefore assumed that the property's boundaries were identifiable and there had been no erosion of the 3.353 acres. *Id.* Thus, *York* did not address a situation involving land affected by subsidence and other processes like erosion.

are these: (1) tide waters did not cover the *York* property,[16] and (2) *York* involved only subsidence without any erosion.

b. *The trial court's findings distinguish this appeal from York.*

Several of the trial court's findings relate directly to *York* and whether *York* controls this case. According to the Port, if we uphold these findings, *York* does not control this case. We will consider first the court's findings that the boundary of Tract 1 cannot be distinguished from the Old River and that the boundary on one side of the property, which followed "the meanders of the Old River," cannot be identified now.[17] We then will turn to the findings reflecting the court's decision that one cannot determine the extent to which subsidence, as opposed to erosion, contributed to the submergence of Tract 1.

 THI claims these findings are both legally and factually insufficient. A trial court's findings are reviewable for legal and factual sufficiency by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). In determining whether legally sufficient evidence supports the trial court's findings of fact, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *See City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not disregard it. *See id.* at 827. We must determine whether the evidence at trial would enable a reasonable and fair-minded person to find the facts at issue. *See id.* The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See id.* at 819. Evidence is conclusive only if reasonable people could not differ in their conclusions. *See id.* at 816.

 When a party attacks the legal sufficiency of an adverse finding when it had the burden of proof on the issue,[18] it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). We first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If no evidence supports the finding, we then examine the entire record to de-

---

**16.** THI claims tide waters must have covered the *York* property because it was in the same general area as Tract 1 but south of Tract 1, meaning that it was closer to Galveston Bay and the Gulf. Yet, as we have noted, the *York* court stated quite explicitly that it assumed—and expert testimony showed—that tide waters did not affect the property. *Id.* at 951.

**17.** This finding is significant because it relates directly to whether the property eroded or subsided. According to at least one of the experts, if Tract 1 had merely subsided, it simply would have dropped and its boundaries would have remained relatively intact.

**18.** According to THI, by stipulation it owned record title to Tract 1; so, because the Port sought to divest THI's record title, the burden should have been on the Port and Kirby to prove the Port held a superior right to THI's title. THI pursued a trespass to try title claim as a counterclaim. The Texas Supreme Court recently held that a trespass to try title suit is the proper cause for all land title disputes, including boundary disputes. *Martin v. Amerman,* 133 S.W.3d 262, 264–67 (Tex.2004). THI is correct that one of the ways to prevail in such a suit is "to prove a regular chain of conveyances from the sovereign," *see id.* at 265, but a trespass to try title plaintiff must also prove the location and identity of the land. *See Hancock v. Moore,* 137 S.W.2d 45, 50 (Tex.Civ.App.-El Paso 1939), *aff'd,* 135 Tex. 619, 146 S.W.2d 369 (1940). As discussed in greater detail below, THI did not prevail on those requirements.

termine if the contrary proposition is established as a matter of law. *Id.* We may sustain the issue only if the contrary proposition is conclusively established. *Id.*

■■■ In reviewing a factual insufficiency point, we consider all the evidence presented at trial. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. We may set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.* Unchallenged fact findings are binding on this Court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex.1986).

To resolve these issues, we examine the evidence presented by both side's experts, who testified extensively concerning their opinions.

(1) The boundaries of Tract 1 cannot be located.

■■■ We turn now to consider the trial court's finding that the boundaries of Tract 1 could not be located. Before addressing the fact findings THI challenges, we set out those THI does not challenge:

● "A 1916 topographical map (Common Exhibit 29) shows that the land at the location in question was generally in the shape of what the parties and witnesses called a 'Rabbit's Head.' No such shape can now be identified at the location in question. The shape of the tract surveyed by THI's surveyor, Bill Merten, is called 'Tract 1' and differs materially in shape from the historic 'Rabbit's Head.'"

● "At present, there exists at the location what the parties and witnesses have called a 'Flat' This Flat is typically covered by tidal waters but is occasionally uncovered, as shown by many of the photographic exhibits. While there exists a drop off to the north of the Flat, the evidence shows that this was created by dredging. The Flat extends to the south beyond the boundaries claimed by THI for the 27–Acre Tract. The topography of the Flat is generally flat, with minor differences in elevation."

THI's expert testified that he could locate the border described as "the meanders of the Old River." The Port's and Kirby's expert testified, on the other hand, that she could not find the border of Tract 1 defined by the meanders of the Old River. The dispute on this issue turned on which expert used the proper method for locating the meanders. We first review the method THI's expert used to determine the northern and western boundaries of Tract 1.

THI's surveyor, William Merten, is a Licensed State Land Surveyor ("LSLS")[19] in Texas who surveyed the property for this litigation. THI hired Merten to survey all of Tract 1, but for purposes of this issue the only portion of Merten's survey in dispute is his survey of the northern and

---

19. Merten testified that there were approximately seventy LSLSes in Texas, and that they are qualified to file surveys and field notes delineating boundaries between State and private land with the General Land Office. A Registered Professional Land Surveyor ("RPLS"), in contrast, is not qualified to file such surveys. According to Merten, there are about 2,500 RPLSes in Texas.

western boundaries of Tract 1—the "meanders of Old River."

Merten surveyed the area to the north and east of Tract 1 with the goal of locating the bank of the Old River as it was before Kirby's predecessor dredged it out. To find this portion of the bank, Merten visually inspected the site, viewed photographs, and reviewed a Corps of Engineers dredging permit. He described his methodology as an estimate of where he believed the historic meander shoreline should have been. Merten's "thinking was where will the line be if the barges were not there, if the area was not dredged." So, he "came up with an estimate of—where you see here of where I believed the natural line would be if all this man-made activity had not occurred." Thus, Merten drew the line along the north and northeast in the dredged area based on his belief of where he believed the natural, now submerged, meander line should have been. When asked at trial whether a boundary existed on the river bottom today that someone attempting to retrace Merten's steps could find, Merten responded, "On the river bottom, no."

To survey the boundary to the north and west, Merten employed a "probing" technique in which he walked into the water over the submerged land as he probed the bottom to locate the purported submerged bank of Old River. Merten described the "probing" as wading through the water while hanging onto a boat. He felt the bottom with his feet, alternately stepping from hard to soft ground, while taking

Global Position System ("GPS") readings at intervals so that he could connect them and draw a line. The hard ground he assumed was the former bank of Old River.

Merten admitted that he had never before used "probing" to locate a submerged boundary line. Merten also acknowledged that there were no authoritative sources stating that probing was an accepted method, and even offered (perhaps unwittingly) that "[w]e are on uncharted grounds here." None of appellees' witnesses testified that probing was an accepted procedure to identify a submerged boundary line in a title dispute.[20]

The Port's surveyor, Nedra Foster, also an LSLS, testified that, given the existing site, the only way to survey the meanders today was to survey the line of mean high tide. She explained that the line of mean high tide is the proper line to use because the chain of title for Tract 1 is derived from a common-law grant located within a tidally influenced area. Foster's mean high water survey reflected that the only existing meander lines between upland and water are the present meanders of Old River and the San Jacinto River around an island, which is what THI calls Tract 2. Foster testified that if she literally followed an 1896 deed description, the only land above water remaining at the site would be a small site less than one tenth of an acre, described as the "Little Thumb." She also identified two other "very small portions" of emergent land outside of the original 27–Acre Tract. Merten's own

---

**20.** THI also contends the trial court should have considered the deposition testimony of Sid Bouse, a surveyor initially designated by the Port and then de-designated in favor of Nedra Foster, who testified that he would use a similar method to find submerged boundaries. If the trial court did not consider this testimony with the other evidence THI presented and determined Merten's survey to be unreliable, THI contends this constitutes an abuse of discretion. However, the trial court does not abuse its discretion merely because it determines the correctness of conflicting expert opinions in a way one party does not like. Additionally, the court limited both parties to one expert on this issue, which, in its discretion, it could do.

mean high tide survey substantially agreed with Foster's survey.

THI contends that Merten's survey of these boundaries provides undisputed evidence that a licensed surveyor could and did identify and locate the current "submerged boundaries" of Tract 1 along the meanders of Old River, while the Port's surveyor, Nedra Foster, did not even try to survey these boundaries.[21] THI maintains that, if it is legally permissible for a surveyor to survey the boundaries of private land that is shallowly submerged due to subsidence, then its surveys stand as undisputed evidence of the boundary. Thus, while THI complains about the trial court's fact findings, it frames the issue as one of law.

We agree with THI to the extent that the issue is one of law. The Texas Supreme Court, in discussing the determination of a waterfront boundary in *Kenedy Memorial Foundation*, stated, "But here, as in *Luttes*, the exercise is made no easier by basing the boundary determination on a surveyor's subjective observations of the terrain. For certainty in land titles, it is important to have a rule, and the civil law as interpreted in *Luttes* provides one." 90 S.W.3d at 284. Thus, the determining question here is not whether a surveyor *could or did* mark lines for the northern and western "meander" boundaries of the tract, but whether the surveyor properly surveyed lands bounded and covered by tidally-influenced waters. As our discussion of the relevant law makes clear, the only valid way to survey such land is to survey the line of mean high tide. *See Luttes*, 324 S.W.2d at 175; *Rudder*, 293 S.W.2d at 741. THI argues that its land

became submerged as a result of subsidence and therefore, based on the Texas Supreme Court's holding in *York*, it is legally permissible to survey the submerged property. But, as we discuss in greater detail below, we reject THI's argument that subsidence alone is responsible for the submergence of Tract 1, and therefore we reject its attempted survey of the submerged property as legally insufficient.

▮▮▮▮ Moreover, in a trespass to try title case, the general test for determining the sufficiency of a description of land is whether the tract can be identified with reasonable certainty. *Zobel v. Slim*, 576 S.W.2d 362, 369 (Tex.1978). The 1896 Magee/Hudson deed provides a metes and bounds description that includes calls to the meanders of Old River. "[M]eander lines of surveys of land adjacent to or bounding upon a stream are not to be considered as boundaries, but they are to follow the general course of the stream, which itself constitutes the real boundary." *Stover v. Gilbert*, 112 Tex. 429, 247 S.W. 841, 843 (1923). Thus, there can be no "meanders" or distinct boundaries created by the course of Old River in this case when the waters of Old River cover the site. The evidence demonstrated that Merten's hypothesized survey outline— based on purportedly submerged banks and his belief as to where the natural boundary would have been but for dredging—is not reliable. We therefore agree with the trial court's finding that the northern and western boundaries of Tract cannot be identified or located today. We also find the evidence is legally and factually sufficient to support the trial court's finding that Tract 1 cannot be distin-

---

21. THI also points to a survey prepared by F.G. Huffman, an RPLS, who also surveyed the northern and western boundaries for THI in 2002. Merten testified that Huffman used a probing technique from a boat to locate the purported submerged boundaries. The parties dispute whether Huffman's survey was consistent with Merten's. THI ultimately chose Merten over Huffman as their designated surveyor, and did not call Huffman at trial.

guished from the surrounding area and the bed of Old River.

(2) The effect of subsidence cannot be assessed.

THI also complains that the trial court erred when it held that no one could assess the extent to which subsidence and/or erosion caused Tract 1 to become submerged. The trial court's finding is set out below:

> The physical evolution of the 27 Acre Tract over time was caused by various natural and man-made forces, including subsidence, erosion, deposition, accretion, flooding, tidal inundation, sea level rise, dredging, dredge spoil dumping, boat wakes, storm surges, and the location of sunken barges and barge fleeting in The Big Empty.[22] The effects of all of these varied forces on the site cannot be separated, and the extent to which subsidence versus erosion contributed to the submergence cannot be determined.

THI attacks this finding, claiming that the evidence conclusively shows that subsidence caused the submergence. Alternatively, THI contends the trial court misplaced the burden of proof and applied incorrect legal standards, and the evidence is insufficient to support the finding. To resolve the issue, we examine the evidence presented by both sides' experts, who testified extensively concerning their opinions.

### (i) The experts did not agree.

THI relied primarily on its experts Robert Gabrysch and Dr. William Dupre. Gabrysch is a hydraulic engineer and groundwater hydrologist with an extensive background in land surface subsidence in the Houston/Galveston area. Dr. Dupre is an associate professor at the Department of Geosciences at the University of Hous-

ton, where he has been a member of the faculty for twenty-eight years. His stated areas of expertise are in sedimentology, geomorphology, and photo interpretation.

Gabrysch testified that his studies and physical inspection of Tract 1 led him to believe the amount of subsidence was probably between eight and nine feet. Dr. Dupre concurred and ultimately concluded that but for man-made subsidence resulting in groundwater withdrawal from the subsurface, Tract 1 would not be submerged today. Dr. Dupre supported his conclusion with (1) photographs of the area taken over the past 75 years showing the shape of the tract consistently shrinking and gradually sinking beneath the water, (2) historical photographs and inspection of the land showing the preservation of natural channels or splays over time, and (3) the presence of buried tree trunks on the tract, which he opined would have been undercut and washed down river had the land been eroded away.

Dr. Douglas Sherman testified on behalf of the Port and Kirby. At the time of trial, Dr. Sherman was a tenured professor and head of the Department of Geography at Texas A & M University, specializing in geomorphology and sedimentology. Dr. Sherman refused to adopt Gabrysch's opinion of the amount of subsidence that had occurred in the area of Tract 1, and he also disagreed that subsidence alone could account for the changes in the shape of the site over time. In support of his opinion, he pointed out that the historic shape of the property, which the parties referred to as a "rabbit's head," could no longer be identified. He explained that "[i]f subsidence were the only force of change at this site, we would still see that rabbit's head preserved. It would just be deeper." Dr. Sherman also disagreed with Dr. Dupre's

---

22. "The Big Empty" was the name of the area where Kirby operated its barge fleeting business, located to the north and east of and adjacent to Tract 1.

opinion that subsidence alone caused the tract's submergence. Further, Dr. Sherman testified that both subsidence and erosion were acting on the property, and he concluded that even if he were to exclude the effects of subsidence from his analysis of the submergence of the tract, most, if not all, of the property would still be submerged. According to Dr. Sherman, the area was transformed from a rabbit's head to a submerged and featureless flat by a number of forces, including erosion, deposition, and human activities such as dredging, as well as subsidence. Viewing all the circumstances, Dr. Sherman testified that he could not quantify the degree to which the various causes impacted the site.

The parties' experts also disagreed concerning the reasons why the tract was not submerged to a depth consistent with the amount of subsidence in the region. In 1916, most of the original 27 Acre Tract was less than two feet in elevation above mean sea level. THI's experts contended the tract had subsided approximately eight feet, so presumably the tract should have dropped to approximately six feet below sea level. However, evidence showed depths of one to one and one-half feet below sea level, the deepest measurement being 1.7 feet. Dr. Dupre testified that, next to subsidence, the most influential process at work on the tract was the deposit of sediment onto the land as water moved across it. He opined that more sediment was deposited than was lost to

erosion, resulting in a net accretion (deposit of sediment) on Tract 1 of one and one-half feet to five feet in the area.

However, Dr. Sherman, the Port's and Kirby's expert, testified that four or more feet of accretion would be needed to make up the difference, and, while he agreed that there was "net deposition" at the site, he disputed the amount of deposition proposed by THI.[23]

(ii) Testimony supports a finding that one cannot assess the degree to which subsidence or erosion caused submergence.

Based on our review of the record, we find the evidence is legally and factually sufficient to support the court's finding that one could not ascertain the extent of erosion versus subsidence.[24] THI would have us hold that the finding is insufficiently supported by evidence because no witness testified that Tract 1 had not subsided, and no witness testified, based on any scientific analysis, that Tract 1 had subsided less than approximately eight feet. Further, THI points out that even Dr. Sherman acknowledged that subsidence had occurred at the THI property, although he could not say how much. The Port's surveyor, Foster, also acknowledged that the area has been affected by subsidence. However, though it may be undisputed that subsidence has occurred, that fact does not render the court's finding insufficient. The finding acknowledges Tract 1 has subsided, but finds that the

---

**23.** Dr. Sherman testified in part:

I don't know where the sediment would come from. We've seen the reports that 80–plus percent of the sediment supplied by this river is blocked out by the Lake Houston Dam. We have to add on to that but Lake Houston Dam takes out probably a hundred percent of the sand supply. I mean, we would of had to have an incredible scavenging of the flood plain to get all this material. Even if we accepted that,

there's no reason for it to make a pile here and nowhere else on this part of the basin.

**24.** THI also claims that the trial court imposed an "irrebuttable presumption" of state ownership of submerged lands that could not be overcome. We disagree that the trial court imposed an "irrebuttable presumption" against it. The trial court simply held against THI on crucial fact findings.

extent to which subsidence versus erosion contributed to the submergence cannot be determined.[25] Even THI's experts acknowledged that subsidence was not the only factor at work. Dr. Dupre stated that "by looking at the historical maps and aerial photos, its clear that you can document evidence of subsidence, of naturally occurring sediment deposition, naturally occurring bank erosion and the presence of human-in-place dredged materials. So all of these processes to—to one extent or another have been dominant."

Thus, the trial court's finding of fact is supported by legally and factually sufficient evidence. We overrule this issue.

### 3. Other Appellate Case Law Allowing Private Ownership of Land Under Tide Waters and Rivers Either is of Dubious Value or Distinguishable.

We now turn to THI's third claimed exception to the general rule, that the state owns all land under tidewaters: appellate case law other than *York*. From our perspective, THI uses these cases to try to chip away at *Luttes*, *Rudder*, and *Lorino*, but, as we explain below, these cases are distinguishable and three of the four were handed down before the *Luttes*, *Rudder*, and *Lorino* trilogy.

THI primarily relies on four cases other than *York*—*Diversion Lake Club v. Heath*, 126 Tex. 129, 86 S.W.2d 441 (1935), *Fitzgerald v. Boyles*, 66 S.W.2d 347 (Tex.Civ.App.-Galveston 1931, writ dism'd), *Fisher v. Barber*, 21 S.W.2d 569 (Tex.Civ.App.-Beaumont 1929, no writ), and *Port Acres Sportsman's Club v. Mann*, 541 S.W.2d 847 (Tex.Civ.App.-Beaumont 1976, writ ref'd n.r.e.)—to argue that "submergence does not necessarily destroy the title of the

owner." *York*, 532 S.W.2d at 954.[26] *Heath* involved land submerged by an artificial lake created after a dam was constructed. *Heath*, 86 S.W.2d at 442. *Fitzgerald* and *Fisher* involved land that either became submerged by tidal waters or became dry as a result of the creation of a channel. *Fitzgerald*, 66 S.W.2d at 348; *Fisher*, 21 S.W.2d at 569–70. In each of these cases, the character of the property was not changed as a result of the ordinary force of the water; there was no "transportation of the land beyond the owner's boundary to effect that result." *See York*, 532 S.W.2d at 954 (citing 5A Thompson on Real Property § 2562 (Grimes ed.1957)). In *Mann*, the trial court analogized the submergence of marsh land by the continued use of air boats through the marsh over a long period of time to the construction of the dam in *Heath*, and reasoned that the landowner did not lose title to submerged land although the landowner could not exclude others from fishing in the waters above the property. *Mann*, 541 S.W.2d at 849–50.

We do not find these cases controlling here. First, they are distinguishable. None of the cases involved erosion or other forces that we have in this case. Second, to the extent they arguably cast any doubt on the bright line rules announced in *Luttes*, *Rudder*, and *Lorino*, we think it significant that three of the cases were written before *Luttes*, *Rudder*, and *Lorino*, and the fourth, without mentioning *Luttes*, *Rudder*, and *Lorino*, relies on one of the earlier three to reach its result. To our reading, the trilogy of *Luttes*, *Rudder*, and *Lorino* recognized and explained the bright line rules that have long dictated land ownership. And, the trilogy of *York*,

---

**25.** In effect, THI would have us hold that any amount of subsidence precludes the application of the general law applied to land under tide waters. This we refuse to do.

**26.** *York* cites the three older cases in support of its statement that submergence does not necessarily destroy the title of the owner. *See York*, 532 S.W.2d at 953–54.

*Kenedy Memorial Foundation,* and *Brainard* reaffirmed the bright line rules. As the Court recently confirmed in *Kenedy Memorial Foundation, Luttes* is still the law:

> The Court's interpretation of the civil law in *Luttes* is reasonable and workable, and it has provided a rule for determining boundaries for more than forty years. While we recognize that the subject is not beyond reconsideration, *stare decisis* is never stronger than in protecting land titles, as to which there is great virtue in certainty. We would be very reluctant to discard a rule determining seashore boundaries that has served as long and satisfactorily as the rule in *Luttes,* thereby upsetting long-settled expectations, and we could not do so absent far more compelling evidence than can be offered here.

*Kenedy Mem'l Found.,* 90 S.W.3d at 281 (citation omitted).

As was the case in *Kenedy Memorial Foundation,* "nothing in the record and argument now before us convinces us that we should reconsider the rule determined in *Luttes.*" *See id.* For these reasons, we choose not to follow whatever rule or exception is created by the four cases THI cites. Instead, we choose to follow the six Supreme Court cases that announce and reaffirm the *Luttes/Rudder* bright line rule.

**4. The Trial Court's Judgment Does Not Violate the Takings Clause**

 Next, THI contends the trial court's ruling constitutes a taking in violation of the Texas and United States Constitutions. *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 17. Although we depend on the fact-finder to resolve disputed facts regarding the extent of governmental intrusion, the ultimate issue of whether the facts constitute a taking is a question of law. *See City of Austin v.*

*Travis County Landfill Co.,* 73 S.W.3d 234, 240–41 (Tex.2002).

THI relies on *York* and *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), to argue that submergence by subsidence is not an inherent hazard of owning Tract 1 and there is no exception to the takings clauses that would permit the State to take THI's land without just compensation. However, as we have held, Tract 1 was not affected by subsidence alone, and this and the other factors discussed remove it from the rule applied in *York.* THI acknowledges that the possibilities of loss of land from processes such as erosion are limitations on the ownership rights of the State and private landowners along riparian or littoral boundaries. *See Brainard,* 12 S.W.3d at 18 ("A riparian owner thus ... loses title to portions of the land that are worn, washed away, or encroached upon by the water."); *York,* 532 S.W.2d at 952 ("The general rule is that a riparian or littoral owner acquires or loses title to the land gradually or imperceptibly added or taken to or from his fast bank or shore."). The trial court likewise recognized and applied these limitations, and its order does not effect an unlawful confiscation of THI's property. Nothing in *Lucas* is inconsistent with this result. THI cites no Texas case involving riparian or littoral property in which it was held that property lost as a result of natural occurrences or even natural occurrences in conjunction with manmade causes violates the takings clause, and we are not aware of any.

**C. Any Pieces of Disputed Property Above the High Tide Line Also Are Owned by the Port.**

**1. THI's Complaints.**

 THI's next issue pertains to several findings of fact and one conclusion of

law. The trial court found that the entirety of Tract 1 became submerged at some time in the past and that the portions of the tract that now lie above mean high water re-emerged as the result of the deposit of dredge spoils by Kirby and its predecessor, Western Towing, and concluded that the small portions of Tract 1 currently lying above the water line resulted from "self-help" by THI or its predecessors, so that THI does not own these small portions of land.

The contested findings of fact are as follows:

- "Over a period of decades, the 27–Acre Tract became submerged below the line of mean high tide. This submergence occurred gradually and imperceptibly and caused the historic meander boundary of the 27–Acre Tract to slowly contract and eventually to disappear."

- "The only existing meander lines between land and water that now exist at the location are the present meanders of Old River and the San Jacinto River around an Island, part of which is claimed by THI to lie within the 27 Acre Tract, and most of which is claimed by THI to lie within the northerly part of the Island, called 'Tract 2' by THI."

- "Small portions of land above the line of mean high tide within the area claimed by THI as the 27 Acre Tract arose from submerged soil beneath the waters of Old River due to the deposit of dredged spoil, sunken barges, and accretion caused by the sunken barges and barge fleeting in and around The Big Empty. These small portions of land would not exist but for such activities, which were conducted by the lessees of the Carter heirs, namely Western Towing and Kirby."

**2. Some Evidence Shows that Tract 1 was Permanently Submerged in the Past.**

THI's surveyor, Merten, identified three areas within his survey of Tract 1 that lie above mean high water. THI first contends there is no evidence that the portions of Tract 1 above mean high water ever were permanently submerged below mean high tide in the past. THI points to the testimony of its expert, Dr. Dupre, who testified that he saw no evidence that Tract 1 ever became completely submerged except perhaps during major storm events, and every aerial photograph he reviewed showed emergent land. In contrast, Dr. Sherman, the Port's expert, testified that the submerged areas of the site had been submerged "at least since 1973," and that at some point, the entire area became submerged. Dr. Sherman explained that he reviewed a number of sources to support his opinion, including aerial photography of the property, maps produced by the Bureau of Economic Geology showing the site completely inundated by storm surges from hurricanes Beulah and Carla, and another map from the Bureau depicting submerged lands of the Texas coast that showed, based on 1979 aerial photography, no island visible at all.

THI argues that Dr. Sherman's opinions are suspect because he admitted he did not know what the level of mean high tide was in photographs he reviewed, and he relied on a map which THI contends was based on a photograph taken when the water level was elevated. However, these arguments ignore the totality of Dr. Sherman's testimony concerning the bases for his opinions. Concerning the map, Dr. Sherman explained that the high tide readings THI complains of were only recorded from a remote, single tide gauge in Trinity Bay, and there were no tide gauge readings directly applicable to Tract 1 when the

photograph was taken. He also testified at length about the reasons why he interpreted the map to show that Tract 1 was completely submerged, including the absence of vegetation at the site, and he interpreted the map's data to mean that the entire area was submerged.

### 3. Some Evidence Proves that Portions of Tract 1 were Above Mean High Tide Because of Self–Help.

THI next challenges the evidence supporting the trial court's findings that the small portions of land above mean high tide were the product of dredging and other self-help activities of the Carter Heirs' lessees, Western and Kirby. Much of the testimony THI relies on is from witnesses who did not see dredging occur, did not engage in dredging, or had no knowledge of dredging. For example, a witness for the Port did not know of any dredging in the area, and a representative of the Carter Heirs testified they did not dredge or deposit spoils on or near the tract. Earl Thrift, Jr., who lived just north of Tract 1 from 1979 through 1983 and piloted tugboats in the area since 1983, testified he never observed dredging along the tract.

THI acknowledges that Patrick Smith, a Western Towing employee from 1989 through 1995, testified that Western Towing did some dredging on the Carter Heirs' property, but emphasizes that he testified that the dredge spoil was to be dumped either in hopper barges or on dry land—not in the waters of Old River. And, after Smith left Western, he testified that he spent the next seven years, until 2002, managing a business next door to Tract 1, and saw no dredging adjacent to Tract 1 by Kirby or anyone else. However, Smith admitted that he did not know what dredging activities may have occurred in the area before 1989. He also acknowledged that he did not actually

watch the dredging operations on a daily basis and agreed that it was possible that dredge spoil could have been dumped elsewhere. He also acknowledged that the bottoms of the barges were largely rusted out, and dredge spoil could have leaked from them.

In addition to the evidence that Western Towing conducted dredging operations at the site, Dr. Sherman testified that the re-emergence of "land" at the site, which was completely submerged, was caused by the placement of barges and the dumping of dredge spoil. Dr. Sherman also testified that the barges anchored at the site in the 1980s changed the flow pattern of the water around them, causing the deposit of sediment in shoals forming behind them and preventing even greater erosion from occurring. Sherman testified that "if the barges weren't here anywhere, I don't think there would be any land above mean high water anywhere." He also explained, based on an aerial photograph, that there was "clear visual evidence that material has been deposited by human means.... [A]nd in this circle that's labeled as the thumb, there was also a dredge spoil disposal. And along the line between these circles called the islet and barge debris, there was also a line of material deposited." Dr. Sherman concluded that, except for human activity, "this site would have been washed over routinely." Dr. Dupre, THI's expert, also testified that he identified evidence of dredge spoils in the three areas, including the area of the "thumb."

We hold that the evidence is both legally and factually sufficient to support the trial court's fact findings.

### 4. The Court Correctly Concluded as a Matter Of Law that Portions of Tract 1 Were Above Mean High Tide because of Self–Help.

Additionally, we agree with the trial court's conclusion of law concerning self-help. A private party may not acquire title through self-help that raises land from submerged land lying under tidal waters. *Brainard,* 12 S.W.3d at 19 ("A widely recognized exception to the general rule is that accretion does not belong to the owner of the land adjoining the water when the owner causes the accretion."); *York,* 532 S.W.2d at 952 ("A riparian or littoral owner may not acquire title to submerged land through self-help by filling and raising the land level."). An island arising out of the bed of a navigable stream or the submerged lands of a tidewater bay becomes the property of the State. *See Giles v. Basore,* 154 Tex. 366, 278 S.W.2d 830, 835 (1955); *Lakefront Trust, Inc. v. City of Port Arthur,* 505 S.W.2d 606, 609 (Tex.App.-Beaumont 1974, writ ref'd n.r.e.).

THI contends that if dredge spoils were placed elsewhere along Old River, but then were washed onto Tracts 1 or 2 by the water, that would not constitute self-help depriving THI of the upland acreage. For this proposition, THI cites *Natland Corp. v. Baker's Port, Inc.,* 865 S.W.2d 52 (Tex. App.-Corpus Christi 1993, writ denied). THI also contends *Natland* supports its claim that the actions of the Carter Heir's lessees should not be attributed to THI. In that case, Natland's predecessor granted the Corps of Engineers a spoil disposal easement on which the Corps piled spoil from the dredging of the intracoastal waterway. The spoil was placed on dry land inland from the shore. *Id.* at 56. Over time, by the action of rain, wind, and gravity, some of the spoil gradually was washed from the piles toward the sea, extending the land seaward. *Id.* at 57. The *Natland* court held that the upland owner gained title to the land created by the gradual

run-off of that material. *Id.* at 58. The court also held that the owner's granting of a dredging easement to the Corps of Engineers "was not sufficient participation by the owner to require forfeiture of his right to the resulting accretions under the principles of *Lorino.*" *Id.*

However, we have already determined that legally and factually sufficient evidence supports the trial court's findings, disputing THI's claim that the emergent areas were the product of accretions onto dry land. We also find *Natland* distinguishable on the issue of self-help, because the grant of an easement to a government authority to dump dredge spoil from a project unrelated to the owner's property is not the equivalent of a lease to private entities to conduct barge fleeting and related dredging operations at the site.

We therefore overrule this issue. Having overruled each of THI's issues related to ownership of Tract 1, this concludes our discussion of that issue and we turn to the second broad issue in the case, the southern boundary of Tract 1.

## II. Part 2: The Surveying Issues

We now consider the second part of THI's appeal, which concerns the location of the southern boundary of the J.T. Harrell survey. As the trial court found, Tract 1 is bounded by (1) the Jones–Hare line to the east (a vertical, north-south line), (2) the south line of the J.T. Harrell survey to the south (a horizontal, east-west line), and the meanders of Old River to the north and west. The location of the Jones–Hare line is undisputed. And, we have already determined that the 1838 meanders of the Old River cannot be located today. Therefore, the only remaining boundary issue is the location of the south line of the J.T. Harrell survey.[27]

---

27. To give a better visual of the location of the

boundaries, assuming the property is very

This issue was hotly contested by the parties, because THI's placement of the line—several hundred feet further south than the Port and Kirby locate it—gives THI more land in Tract 1 and could establish that Tracts 1 and 2 are contiguous. As discussed in greater detail in Part 3 of this opinion, the placement of the south line is central to THI's claim that it owns Tract 2.

THI raises five issues challenging the trial court's fact findings and conclusions of law, which adopt Foster's survey of the south line of the J.T. Harrell survey as the correct one and find Merten's survey incorrect and unreliable. In issues seven through nine, THI attacks Finding of Fact No. 20, set out below:

> The J.T. Harrell line is correctly located by the survey of Nedra Foster (Kirby Exhibit 2), which is incorporated herein as if set out verbatim. This is the same line as that found by the surveys of J.S. Boyles that were patented by the Texas General Land Office in 1936 and 1953.

THI contends (1) the trial court erred by concluding that the southern boundary of Tract 1 is correctly located by Foster, (2) if Finding No. 20 is correctly a fact finding, there is no evidence, or alternatively, insufficient evidence to support it, and (3) the trial court committed harmful error by excluding evidence demonstrating errors in Boyles's surveys on which Foster relied.

In its tenth issue, THI challenges the trial court's finding that Merten's survey was incorrect and unreliable, and in its eleventh issue, THI contends there is no evidence, or alternatively, insufficient evidence to support the finding that the riparian boundaries of Tract 1 cannot be surveyed.[28]

## A. The Facts Relating to the Relevant Historical Surveys.

In 1838, H. Trott surveyed a tract of public land conveyed by the Republic of Texas to J.T. Harrell. In 1845, Trott's survey was patented by the General Land Office ("GLO"). The description of the J.T. Harrell survey was as follows:

> ... beginning at the mouth of Bear Bayou, at the point, Thence south 62½ degrees west, 4300 varas to a stake and mound in the prairie the same being Carpenter & Harris corner as corrected by order of the commissioner general. Thence east 5820 varas with this line to the San Jacinto River, Thence up the west bank of same as it meanders to the beginning.... [29]

Trott's survey, being the oldest survey of this property, is considered the senior survey of the J.T. Harrell grant; later surveys are considered junior to it. The property we know as Tract 1 was part of the J.T. Harrell grant.

loosely in the shape of a triangle, we know the location of the vertical line (the Jones–Hare line), which is on the right side of the triangle, we know only in a very general sense the location of the diagonal (meandering) line (the meanders of the Old River to the north and west, which have been eroded away), and now we are attempting to set the location of the horizontal line at the bottom of the triangle (the south line of the J.T. Harrell survey).

28. To the extent we have already addressed these two issues in Part 1 of this opinion, we will not revisit them; we will address only

THI's issues concerning the placement of the south line of the J.T. Harrell survey.

29. Apparently, Trott's survey reflected an erroneous belief that the Harris/Carpenter grant extended north to a common boundary with the Harrell grant. A vacancy was later found to exist between the Harrell grant and the actual north boundary of the Harris/Carpenter. Therefore, the call for adjoinder to the Harris/Carpenter survey cannot be relied upon to find the southwest corner of the J.T. Harrell Survey.

In 1895, Tract 1 was severed from the larger tract and sold separately. Tract 1 was first described in the deed of May 27, 1895, from Mary Jones to J.P. McGee, and then described in the deed of February 15, 1896, from J.P. McGee to Emma Hudson. The Magee/Hudson deed of 1896 described the south boundary of Tract 1 as commencing at the Jones–Hare line (the north-south line forming the eastern boundary), "[t]hence west 1636' feet along the common line of the Harris and Carpenter league and the JT Harrell." Thus, the south line of the J.T. Harrell survey forms the south boundary of Tract 1.

Our record does not reflect another survey of this area until 1936, when J.S. Boyles, then the Harris County Land Surveyor, surveyed purported vacancies existing in areas west of Old River and south of the J.T. Harrell survey. To determine the extent of the vacant land, Boyles was required to fix the surrounding survey lines, including the south line of the J.T. Harrell survey. Boyles found the south line on the ground, reporting to the GLO that

> The J.T. Harrell can be located with a fair degree of accuracy, giving due recognition to [its] beginning call at the mouth of Bear Bayou. [Its] north line, while substantially 2 degrees off of [its] called course, is well marked and recognized on the ground. *The South line of the same is also well recognized and marked on the ground.* By taking the intersection of the two marked lines of the Harrell at their Western terminus,

we find that this point is 1694.2 varas North of the Northeast corner of the Vince Survey and further that Trott in 1838 made this distance, in his survey of the Peter J. Duncan, 1700 varas, which is a very close check after a hundred years.

(emphasis added). Thus, Boyles was able to locate Trott's markings on the ground for the South line of the J.T. Harrell survey. Based upon Boyles's survey, a patent was issued for the W.T. Carter survey, located directly below the south line of the J.T. Harrell grant, and for the W.M. Buehler and B.N. Garrett surveys. The Buehler and Garrett surveys were immediately below the Carter survey and had as their western borders a continuation of the western border of the Carter survey.[30]

In 1951, Boyles surveyed the unappropriated areas east of Old River, and based upon his survey, the State issued a patent to Mary Niedermeier for a 730.6–acre tract abutting and immediately south of the J.T. Harrell survey. The northern boundary of the Niedermeier survey is the J.T. Harrell south line.[31] Thus, both the Carter and Neidermeier surveys share the south line of the J.T. Harrell survey as their northern boundary, the Carter survey to the west and the Neidermeier survey to the east.

## B. The Competing Surveys of the South Line by Merten and Foster.

The placement of the south line was disputed primarily because Trott's 1838

---

30. If one were to imagine three rectangles stacked neatly one on top of the other, the top rectangle represents the W.T. Carter survey, the middle rectangle represents the Buehler survey, and the bottom rectangle represents the Garrett survey. The top horizontal side of the top rectangle is the south line of the J.T. Harrell survey and the left vertical sides of the three rectangles form a single vertical (north-south) line.

31. Niedermier sold a one-half interest in her 730.6–acre tract to the Port in 1952. In 1979, the Port condemned the remaining half interest in the uplands of the 730.6–acre tract then owned by the Carter Heirs. THI does not dispute that the Port owns all of the property immediately south of the south line of the Harrell survey.

description did not include any calls to natural monuments or other objects that could be used today to locate the south line on the ground, and the description merely provided that from the southwest corner the line proceeded "[t]hence east 5820 varas . . . to the San Jacinto River."

### 1. Merten's Method of Locating the Line.

THI's surveyor, Merten, testified that, to locate the south line, he first sought to determine the location of the southwest corner of the J.T. Harrell survey. To do this, he found the north line of the Vince survey (which is south and west of the H.T. Harrell survey), "turned a record angle" based on Trott's field notes, and projected a line 1700 varas north. Merten then sought to trace the east line of the adjacent Duncan survey, which bounds the J.T. Harrell survey on the west, to find a common point.[32] From his southwest corner, Merten then "turned 90 degrees" and projected the J.T. Harrell south line "due east," based on Trott's "thence east" course call.

Merten also testified that he checked his work by determining that the relationship between the angle of the north line of the J.T. Harrell survey and the south line as he placed it was 27½ degrees, which corresponded with Trott's call for the line (coming from the opposite direction) from Bear Bayou to the southwest corner to be on the course of "south 62½ degrees west." By comparison, Merten explained that the angle between Foster's placement of the

north and south lines was 25 degrees, as opposed to Trott's 27½ degrees, and her south line did not run due east.

Merten testified that using record angles was an appropriate method to use to reconstruct a survey when there are no marks on the ground or possession lines that can be connected to the senior survey.[33] Merten acknowledged, however, that from where he placed the southwest corner of the J.T. Harrell survey, his north-south survey line would not correspond with the existing west line of the Carter, Buehler, and Garrett surveys.

### 2. Foster's Method of Locating the Line.

Foster testified on behalf of the Port and Kirby concerning her placement of the J.T. Harrell south line. Foster explained that she set out to find Trott's footsteps on the ground to reestablish his line. Foster testified that she began her survey by locating the calls to the natural objects identified in Trott's 1838 survey, such as the mouth of Bear Bayou and the San Jacinto River. She explained that, because other marks Trott made were gone, she also looked at Boyles's surveys and field notes, and explained that Boyles "had of necessity found the established lines of the senior surveys. And so we also looked at his work where he had found Mr. Trott. The perpetuation of that survey."

She located the southwest corner by locating Boyles's marks on the ground: "When Boyles ran the lines and found the

---

**32.** Merten used Boyles's 1936 survey to find the general area from which he located the southwest corner, but otherwise he rejected Boyles's work as "highly unreliable" to use in locating the south line.

**33.** Merten actually did two surveys, one in May of 2003, and one in September of 2003. He testified that in the September 2003 survey, he placed the south line 10 feet further north than he did in the May 2003 survey.

He also moved the Jones–Hare line 23 feet further east, to be in agreement with the other surveyors' placement of the line. According to Foster, Merten also placed the southwest corner in May 2003 some 137 feet away from where he placed it in September 2003, and his final placement of the point was 83 feet east of Boyles' and Foster's location of the point. THI relies on the second survey.

marks left on the ground, he said that he ran it to an intersection out to the west, and he said that it was 7.4 varas south of the intersection of the railroad and Sheldon Road." Foster testified she located this exact point. Foster then located Boyles's calls for objects along the south line, fixing her south line at the same location as Boyles. Foster further testified that although the junior surveys agreed with Trott's senior survey, she was not using the junior surveys to find the J.T. Harrell south line; she was using Trott's survey of the J.T. Harrell grant.

Foster also testified that she had worked in the area previously, and in 1988 had located the north and south lines of the J.T. Harrell survey in the course of her work. In conducting the survey for this litigation, she checked her earlier work to confirm she had done it correctly. Foster testified she found the south line in the same location where she had located it in 1988.

Foster criticized Merten's reliance on "turning angles" as inappropriate for use in retracing a survey's boundaries. She acknowledged that the bearings on her survey were not exactly 62½ degrees, but stated that bearings were just a guide and were not controlling; rather, what controlled was "the marked line on the ground." Foster also testified that her survey located the south line in the same place as Trott's 1838 survey and Boyles's 1936 and 1951 surveys, and her placement of the south line created no conflicts with the adjacent surveys in the area.

As placed, Foster's line was approximately 325–400 feet further north than Merten's line.

## C. The Law Controlling Surveys and Surveyors.

THI contends the issue of which surveyor correctly surveyed the line is a matter of law. It claims that Trott's survey of 1838 is the senior survey and must control the location of the south line. According to THI, Merten followed well-established law by using Trott's survey to draw the south line due east from the southwest corner of the J.T. Harrell grant. THI contends Foster disregarded Trott's survey and improperly relied on junior surveys to mark Trott's senior survey. Alternatively, THI argues that if the issue is not a matter of law but a fact issue, then (a) there is no evidence or legally insufficient evidence to support the trial court's fact finding that Foster correctly surveyed the southern boundary of Tract 1, and (b) the trial court abused its discretion by not permitting THI to introduce evidence that would demonstrate that Boyles erred in drawing his lines.

## 1. The Location of the J.T. Harrell South Line is a Question of Fact.

 We first address THI's argument that the correctness of the surveyors' work is a matter of law. Texas law is well settled that unless the facts are undisputed, the location of a survey line, as it was run on the ground by the original surveyor, is a question of fact for the jury. *See East Tex. Pulp & Paper Co. v. Cox*, 381 S.W.2d 78, 83–85 (Tex.Civ.App.-Beaumont 1964, writ ref'd n.r.e); *Angelina County Lumber Co. v. McKnight*, 265 S.W.2d 246, 249–50 (Tex.Civ.App.-Waco 1954, writ ref'd n.r.e.). The Texas Supreme Court has explained that "[a]s to what are boundaries, is a question of law for the determination of the court; as to where the boundaries are upon the ground, is a question of fact to be determined from the evidence." *Farley v. Deslonde*, 58 Tex. 588, 591 (1883).

THI cites *Brainard v. State*, 12 S.W.3d at 26, for the proposition that the choice between legally correct and incorrect sur-

veys is a question of law. We conclude *Brainard* does not control here. In *Brainard*, the question was the location of the boundary dividing private property from state property. The boundary was in dispute not because of competing surveys, as here, but because the width of the river had narrowed significantly from 3400 feet to 20–50 feet. *Id.* at 12. The Court had to decide whether the boundary should be based on the present-day riverbed, as advocated by the landowners, or the "natural" riverbed as it existed before the dam was closed. *Id.* at 10–11. The Court held as a matter of law that the boundary line was the present-day riverbed, not the so-called "natural" riverbed, because the State owns the riverbed, and held that the State's survey of the "natural" riverbed did not reveal the true property line. *Id.* at 10, 26. Thus, the State's survey was immaterial, and did not raise a fact issue, because it was not a survey of the boundary line.

In contrast, everyone agrees that the J.T. Harrell survey line is the property line of Tract 1. The only question is which of the competing surveys accurately shows the location of the line as found by H. Trott in 1838. This question is a question of fact. *See Farley v. Deslonde,* 58 Tex. at 591. We therefore briefly review the applicable law and turn to THI's legal and factual sufficiency arguments.

## 2. The Law Governing How to Find the Original Surveyor's Footsteps.

■ When finding the lines of a survey, "[t]he cardinal rule is that the footsteps of the original surveyor, if they can be ascertained, should be followed." *Hurr v. Hildebrand,* 388 S.W.2d 284, 288 (Tex. Civ.App.-Houston 1965, writ ref'd n.r.e.); *see also Humble Oil & Ref. Co. v. State,* 162 S.W.2d 119, 132 (Tex.Civ.App.-Austin 1942, writ ref'd) ("The primary objective in locating a survey is to 'follow the footsteps of the surveyor'; by which is meant to trace on the ground the lines as he actually ran them in making the survey."). If the actual lines and corners run by the original surveyor can be found, they are controlling, even if they are inconsistent with the calls and references in that surveyor's field notes. *See Wheeler v. Stanolind Oil & Gas Co.,* 151 Tex. 418, 252 S.W.2d 149, 151 (1952) (stating that the footsteps of the original surveyor are controlling and prevail over calls for course and distance); *Thatcher v. Matthews,* 101 Tex. 122, 105 S.W. 317, 318 (1907), (stating that when the actual lines run by the surveyor can be found, they constitute the true boundary and cannot be made to yield to course and distance calls); *Teal v. Powell Lumber Co.,* 262 S.W.2d 223, 226–27 (Tex.Civ.App.-Beaumont 1953, no writ) (stating that "if the footsteps of the original surveyor can be identified and followed, they will control the location of the line or boundary in question even though they may not be in harmony with the field note calls").

■ When one can locate on the ground with certainty and without inconsistency the objects or monuments designated by the original surveyor "as marking the lines he actually traced . . ., the survey must be laid out from those points, and extraneous evidence cannot be admitted to contradict the assertion of the surveyor that he actually went to the points he so designated." *Humble Oil,* 162 S.W.2d at 132–33. However, if the location of the actual footsteps of the surveyor cannot be established with reasonable certainty, "all the surrounding facts and circumstances should be considered in order to arrive at the purpose and intent of the surveyor who made the original survey." *Hurr,* 388 S.W.2d at 288.

■ Thus, although the original surveyor's marks and calls are generally con-

trolling, when the surveyor's marks have disappeared over time, the lines and corners of the survey may be established using any evidence tending to show their location that is "the best evidence of which the case is susceptible." *See, e.g., City of Carrollton v. Duncan,* 742 S.W.2d 70, 72, 76–77 (Tex.App.-Fort Worth 1987, no writ); *Angelina County Lumber Co. v. McKnight,* 265 S.W.2d 246, 249–50 (Tex. Civ.App.-Waco 1954, writ ref'd n.r.e.); *Taylor v. Higgins Oil & Fuel Co.,* 2 S.W.2d 288, 300 (Tex.Civ.App.-Beaumont 1928, writ dism'd w.o.j.). Courts generally consider the "best evidence" to be "that evidence which is the more specific and definite as against that which is merely general and indefinite or descriptive." *Taylor,* 2 S.W.2d at 300.

### D. The Trial Court's Decision to Adopt Foster's South Line is Supported by the Evidence.

#### 1. Although Foster Used Boyles's Junior Survey, She Did Not Improperly Rely on It.

▮▮▮ THI contends Foster improperly relied on Boyles's junior surveys to mark Trott's senior survey. THI cites *Strayhorn v. Jones,* 157 Tex. 136, 300 S.W.2d 623, 630 (1957), for the proposition that the description in the senior survey controls when locating a line of that survey over any junior survey of that line, unless the evidence proves that the senior survey is in error.

▮▮▮ Because there is no evidence that Trott made an error in describing the Harrell line, THI contends, Merten correctly performed his survey by relying on Trott's "thence east" course call. However, courts have held that, when the original surveyor's marks can no longer be found, the calls and recitals in a junior survey may be the best evidence of the original boundaries of the senior survey. *Dixon v.*

*Dewhurst,* 169 S.W.3d 515, 518–19 (Tex. App.-Texarkana 2005, no pet.); *Hill v. Whiteside,* 749 S.W.2d 144, 152 (Tex.App.-Fort Worth 1988, writ denied) (per curiam); *Barnes v. Wingate,* 342 S.W.2d 352, 357 (Tex.Civ.App.-Beaumont 1960, writ dism'd). Further, when a subsequent surveyor is shown to have found the natural and artificial objects called for in a senior survey, and to have re-marked those lines and corners in the same location, that subsequent survey will assume the dignity of the original. *Humble Oil,* 162 S.W.2d at 133; *Taylor,* 2 S.W.2d at 301. So, although a junior survey cannot be used to create an ambiguity in or to change the lines of a senior survey, *Kirby Lumber Corp. v. Lindsey,* 455 S.W.2d 733, 739 (Tex.1970), it may be used as evidence of the location of the lines of a senior survey. *Dixon,* 169 S.W.3d at 518–19; *Hill,* 749 S.W.2d at 152.

Foster testified that she sought to find Trott's footsteps on the ground. One of the ways she did that was to find the perpetuation of Trott's survey by looking to county surveyor Boyles's patented surveys, which in turn were based on Trott's survey, to locate the south line of the J.T. Harrell grant. Foster found that, in 1936 and again in 1951, Boyles surveyed the south line of the J.T. Harrell survey as part of his survey of untitled vacancies immediately to the south of that line. Boyles reported at the time that the line was "well marked and recognized on the ground," and filed detailed survey and field notes with the GLO that were the basis for the Carter, Buehler, Garrett, and Neidermeier patents. Boyles's surveys of the vacancies expressly called for a common line with the J.T. Harrell Survey, and detailed physical objects and markings along that line. Using Boyles's surveys and field notes, Foster retraced the south line of the J.T. Harrell survey, just as she

had done in 1988 in a survey not prepared for litigation. Foster did not improperly rely on Boyles's junior survey.

**2. Boyles Located Trott's Marks for the South Line of the J.T. Harrell Grant.**

THI also complains that Foster wrongly assumed Boyles necessarily established the lines of Trott's senior survey when surveying the boundaries of other tracts. THI notes that in Boyles's 1936 survey, he reported that the south line of the J.T. Harrell was "well marked and recognized on the ground," but asserts that there is nothing to connect any marks that Boyles may have found to Trott's survey, and that, after the passage of 98 years between Trott's 1838 survey and Boyles's 1936 survey, there can be no presumption that any marks left were Trott's work.[34]

■ However, Boyles stated that he was able to find Trott's line, and Foster found where Boyles perpetuated that line. Surveyors are presumed to have performed their official duties and to have actually surveyed and marked all the lines to the corners. *See State v. Sullivan*, 127

Tex. 525, 92 S.W.2d 228, 232 (1936) (stating that a surveyor is presumed to have done his official duties); *East Tex. Pulp & Paper Co.*, 381 S.W.2d at 84 (stating that absent proof to the contrary, it is presumed the original surveyor performed his duties, including marking the lines). This is particularly true after their work has been accepted by the GLO. *See State v. Sun Oil Co.*, 114 S.W.2d 936, 945–46 (Tex. Civ.App.-Austin 1938, writ ref'd) (stating that after an extended lapse of time, and issuance of a patent, the county surveyor should be presumed to have properly discharged his official duties). No evidence indicates the line Boyles found was not Trott's line. Additionally, the GLO accepted Boyles's survey and field notes, and the State of Texas issued patents based on those surveys and field notes.

**3. The Trial Court Did Not Abuse Its Discretion by Excluding Boyles's 1951 Field Book and the Testimony of Bouse.**

■ THI also contends the trial court erred in excluding Boyles's 1951 field book and the testimony and exhibits of surveyor Bouse, which THI contends demonstrated

---

**34.** In support of these arguments, THI cites *Gill v. Peterson*, 126 Tex. 216, 86 S.W.2d 629 (1935); *Wood v. Stone*, 359 S.W.2d 68 (Tex. Civ.App.-Houston 1962, writ ref'd n.r.e.); *Teal v. Powell Lumber Co.*, 262 S.W.2d 223 (Tex.Civ.App.-Beaumont 1953, no writ); and *Boyt v. Weiser*, 180 S.W.2d 953 (Tex.Civ.App.-Amarillo 1944, writ ref'd). However, these cases merely illustrate that the general rules have to be applied based on the court's evaluation of the facts and evidence in each case. For example, in *Gill*, the court noted the general rule that "the location of lines or corners of a survey may not be established or controlled by artificial objects or marks not called for in the field notes," but found no error in allowing the surveyor to testify about where he placed marks not referred to in field notes when that evidence aided in locating the surveyor's line. *Gill*, 86 S.W.2d at 631, 632. In *Wood*, the court found no competent evidence that two tracts were adjacent when the junior surveyor was shown to have no

knowledge of the line of the senior survey or any common corners. *Wood*, 359 S.W.2d at 74–75. In *Teal*, the court held that a survey calling for the property to adjoin that of a senior survey was not entitled to the presumption that the surveyor actually surveyed and found the line of the senior survey when there was no evidence the surveyor had any knowledge of the senior survey's line or corners, and all competent evidence was to the contrary. *Teal*, 262 S.W.2d at 237–40. Finally, in *Boyt*, the court held that a piece of flat iron, first seen as a corner marker fifty-eight years after the original surveys of the area were made, and which was not connected in any way to the surveys, was no evidence of the corner's location, and, because of the ambiguities in the original surveys' field notes and uncertainty about the piece of flat iron, the trial court properly admitted parol evidence to establish the south line of the property at issue. *Boyt*, 180 S.W.2d at 955–56.

errors in Boyles's survey. We review the trial court's exclusion of evidence for abuse of discretion. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). Boyles's field book, which was not patented—unlike Boyles's survey and field notes—was properly excluded because the patented survey and field notes control over unpatented field books. *See Stanolind Oil & Gas Co. v. State,* 129 Tex. 547, 101 S.W.2d 801, 808 (1937). Excluding Bouse's testimony and exhibits also was proper because the trial court was enforcing a pre-trial order (sought by THI) limiting each party to one surveying expert, and THI chose Merten over Bouse. Even if the trial court had abused its discretion, however, THI makes no effort to argue or demonstrate that any error was reasonably calculated and probably did result in an improper judgment. *See* Tex.R.App. P. 44.1(a).

**4. Merten's Reliance on Certain Calls in Trott's Survey Was Not the Only Correct Way to Locate the South Line of the J.T. Harrell Survey.**

We turn next to THI's claim that Merten's reliance on Trott's "thence east" course call was the only correct manner of surveying the south line of the J.T. Harrell survey, and that Foster improperly disregarded Trott's course call. As support for this proposition, THI cites the following statement from *Kirby Lumber Co. v. Adams,* 127 Tex. 376, 93 S.W.2d 382, 385 (1936): "[W]here the natural and artificial objects of the grant cannot be identified upon the ground, the proper method of locating the lines and corners will be by course and distance from the nearest recognized and established corner or artificial object with which the field-notes are connected." THI also cites the order of preference courts give to the dignity of surveyors' calls: (1) natural objects; (2) artificial objects; (3) course; and (4) distance. *See*

*Mohnke v. Greenwood,* 915 S.W.2d 585, 591 (Tex.App.-Houston [14th Dist.] 1996, no writ). Because no marks or monuments can now be found along the south line, THI argues, Trott's unambiguous course call must control.

The rule THI relies on, however, does not control when other evidence is available from which the actual location of the survey line can be established. *See Wheeler,* 252 S.W.2d at 151; *Thatcher,* 105 S.W. at 318; *Teal,* 262 S.W.2d at 226–27. Here, Foster found and followed Trott's footsteps. Foster placed the south line at the same location that Boyles found Trott's original marked line, and there are no overlaps or conflicts among these surveys.

■ In addition, Merten acknowledged that Foster's placement of Trott's south line matches Boyles's 1936 and 1951 locations of that line, and matches the location of the Carter, Buehler, and Garrett surveys. Long-recognized and established boundaries will be disturbed only upon the most cogent and compelling evidence. *See Strong v. Delhi–Taylor Oil Corp.,* 405 S.W.2d 351, 375–76 (Tex.Civ.App.-Corpus Christi 1966, writ ref'd n.r.e.) (citing *Blaffer v. State,* 31 S.W.2d 172, 191 (Tex.Civ. App.-Austin 1930, writ ref'd)); *see also Kenedy Mem'l Found.,* 90 S.W.3d at 281 ("*[S]tare decisis* is never stronger than in protecting land titles, as to which there is great virtue in certainty.").

Merten, in contrast, disregarded Trott's physical call to the mouth of Bear Bayou— an existing natural object named in Trott's survey—as the starting point, and instead found a point he believed to be the southwest corner of the J.T. Harrell survey and drew a "due east" line across the area. Merten acknowledged that a surveyor goes out in the field to find the lines as they were marked on the ground, and agreed that one way to find the original surveyor's marks in the field is to see how those

marks have been perpetuated over time. But, Merten did not traverse all of the survey lines he placed to look for marks. Instead, he merely turned an angle and looked at bearings.

Both Merten and Foster agreed that the course calls in a survey can vary from one surveyor to the next. Foster testified that bearings are just a guide, and even Merten acknowledged that it is "very common for two different surveyors to be surveying the same line and have a call for a different bearing." Bearings and course calls should not be used to establish the location of a survey line if there is other reliable evidence showing where it was actually run on the ground. *See Wheeler*, 252 S.W.2d at 151 (footsteps of original surveyor control over calls for course and distance); *Thatcher*, 105 S.W. at 318 (where actual lines run can be found, they constitute the true boundary and cannot be made to yield to course and distance calls).

Based on the foregoing, we hold that the hotly contested issue of the location on the ground of the south line of the J.T. Harrell survey was a fact issue for the trial court to determine. We further hold that the evidence is legally and factually sufficient to support the trial court's Finding No. 20, and its finding that Merten's location of the south line of the J.T. Harrell survey was incorrect. We also hold THI has not demonstrated the trial court reversibly erred in excluding its proffered evidence.

We therefore overrule THI's issues seven through eleven.

### III. Part 3: The Summary Judgments on Tract 2.

In the third part of its brief, THI raises three issues all related to the ownership of Tract 2: In its twelfth issue, it contends the trial court erred when it granted the Port's motions for summary judgment and Kirby's motion for summary judgment in part, determining that THI did not own Tract 2. In its thirteenth issue, THI contends the trial court also erred by not granting its motion for partial summary judgment on its claimed ownership of Tract 2. Finally, in its fourteenth issue, THI contends the trial court erred when it refused to admit evidence from a newly designated photogrammetry expert, Wayne Grip.

THI's only claim of ownership on appeal depends for its success on Tracts 1 and 2 being contiguous. As we explain below, Kirby and the Port moved for summary judgment, in part, arguing just the opposite—that Tracts 1 and 2 are not contiguous. Thus, they argued, if the strip-and-gore doctrine were to apply, it could not apply in THI's favor. We hold that Tracts 1 and 2 are not contiguous and therefore Tract 2 could not have passed as a strip or gore with Tract 1. Because we agree with Kirby and the Port that the strip-and-gore doctrine, if applicable, does not apply in THI's favor, we hold that the trial court properly granted Kirby and the Port's motions for summary judgment, and also properly denied THI's motion. We also determine that excluding Grip's affidavit was not an abuse of discretion.

### A. Procedural History and Background.

All three parties filed motions for summary judgment. THI and Kirby both claimed to own Tract 2. Kirby also pleaded in the alternative simply that THI did not own Tract 2. The Port moved for summary judgment claiming only that neither THI nor Kirby owned Tract 2. Ultimately, the trial court concluded THI did not own Tract 2, though it did not determine who owned the tract. The trial court did not identify any particular basis for its ruling.[35]

Kirby and the Port advanced four bases upon which summary judgment could be granted in their favor: (1) the 1896 deed from Hudson to Magee did not effectively reserve Tract 2 for Hudson's estate; (2) the strip-and-gore doctrine does not apply; (3) if the strip-and-gore doctrine applies, it does not apply in THI's favor; and (4) Tract 2 never truly existed, but was instead located south of the J.T. Harrell line and thus already owned by the Port. These are the four possible bases to support the trial court's grant of summary judgment in appellees' favor. We hold that the third basis is adequate to support the trial court's ruling.

THI advanced several theories for why it owned Tract 2 and thus should receive summary judgment in its favor. These included the following: its predecessors in interest acquired title by adverse possession, the Carter heirs quitclaimed the property to THI, the land was passed under a theory of "more or less" language included in the 1905 deed, and the land was a strip or gore that passed with the 1905 deed.

The Port and Kirby claim that THI has not addressed all possible bases upon which we could affirm summary judgment, and thus we must affirm due to waiver. *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970); *see also F.M. Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000) (stating that when a trial court does not specify the grounds on which summary judgment was based, we must affirm if any of the grounds raised was meritorious). We have carefully reviewed the record and briefing to this court, and we disagree that the issue is waived. THI has attacked all possible bases Kirby and the Port presented upon which we could affirm, and has also presented its own theory upon which it believes we could render summary judgment in its favor or remand for a trial— the strip-and-gore doctrine.[36]

To reverse the trial court's ruling and hold that THI should have received summary judgment in its favor, we must determine that THI's proffered basis of the strip-and-gore doctrine supports its argument that it should have received summary judgment in its favor. However, if Kirby and the Port are correct that the strip-and-gore doctrine cannot apply in THI's favor, then we must affirm the trial court's grant of summary judgment in Kirby and the Port's favor, and its denial of summary judgment in THI's favor. We disagree with THI that the strip-and-gore doctrine would apply to grant it ownership to Tract 2 because the tracts are not contiguous; therefore, we affirm summary judgment.

**B. Standard of Review.**

We review the trial court's summary judgment ruling de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). In our review, we take as true all evidence favorable to the nonmovant, and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.* When the parties

---

**35.** Kirby has not contested the trial court's denial of its motion for summary judgment that it owns Tract 2. Therefore, we are presented only with the question of whether the trial court properly granted the Port's motion to determine THI did not own Tract 2, or if the trial court should have granted THI's motion.

**36.** THI mentions the Carter heirs' quitclaim deeds and adverse possession in its Statement of Facts Pertaining to Tract 2. However, it provides no argument, and no appropriate citations to the record and authorities regarding these theories of ownership. Therefore, they are not properly presented on appeal.

moved for summary judgment on the same issues, as they did in this case, we consider the summary judgment evidence presented by all sides, determine all questions presented, and, if the trial court erred, render the decision the trial court should have rendered. *See id.* We hold that the trial court did not err.

### C. The 1896 and 1905 Deeds.

Kirby and the Port argue that Tract 2 passed from Hudson to Magee in 1896. At that time, Hudson, a minor, owned a significant amount of land including: Tract 1; a 107 acre parcel of land north of the J.T. Harrell line that included the 6.1 acres comprising Tract 2; and 800 acres located south of the J.T. Harrell line and which is contiguous with Tract 2. Hudson's guardian, Farmer, executed a deed selling "all that tract or parcel of land containing 100 9/10 acres out of the north part of 107 . . . ." The deed also contains a metes and bounds description of the land conveyed. Then, in 1905, Farmer executed another deed conveying to Donaldson and Hart Tract 1 and 800 acres south of the J.T. Harrell line. Although no other deeds are recorded transferring Hudson's land between 1896 and 1906, Farmer's inventory of Hudson's estate filed in 1907 did not list the 6.1 acres of Tract 2 as realty Hudson owned. Thus, question the parties attempted to answer below was: what happened to Tract 2?

Kirby and the Port contend Tract 2 passed by the 1896 deed because that deed was ineffective to reserve any portion of the 107 acres. THI counters that the 1896 deed was effective to reserve 6.1 acres— Tract 2—and that the land passed as a strip or gore with the 1905 conveyance to Donaldson and Hart.

THI cannot maintain its claim of ownership under the strip-and-gore doctrine without first proving that the 6.1 acres were effectively reserved. However, we need not determine whether or not the reservation was effective because we hold that, even if it was effectively reserved, THI could not own the property under the strip-and-gore doctrine. Therefore, for purposes of our analysis, we will assume *arguendo* that the 1896 deed was an effective reservation 6.1 acres.

### D. The Strip–and–Gore Doctrine Does Not Apply to Tracts 1 and 2.

■ The strip-and-gore doctrine is intended to avoid litigation by presuming that "a grantor has no intention of reserving a fee in a narrow strip of land *adjoining the land conveyed* when it ceases to be of use to him, unless such fee is clearly reserved." *Cantley v. Gulf Prod. Co.,* 135 Tex. 339, 143 S.W.2d 912, 915 (1940) (emphasis added). The doctrine applies only "to relatively narrow strips of land, small in size and value in comparison to the *adjoining tract* conveyed by the grantor." *Angelo v. Biscamp,* 441 S.W.2d 524, 526–27 (Tex.1969) (emphasis added). Therefore, if the land conveyed does not adjoin the strip or gore, the doctrine does not apply.

Here, the trial court's placement of the J.T. Harrell south line precludes any application of the strip-and-gore doctrine. As the exhibits attached to the findings of fact and conclusions of law show, Tracts 1 and 2 are not contiguous. In addition, no party argues that Tracts 1 and 2 were ever contiguous in 1896 or 1905 at the J.T. Harrell south line, and THI has not pointed us to a place in the record containing proof of contiguousness in 1896 or 1905.[37]

---

**37.** By "J.T. Harrell line" we refer to the trial court's placement of that line, which we af- firmed in Part II of this opinion.

Tract 2 is contiguous with the land to its north, and the 800 acres to its south, which the Port owns. As a result, if it is a strip or gore, it must pass with the land adjoining it, which Tract 1 does not.

THI has not argued on appeal any other legal basis on which it should receive summary judgment. Having determined that Tracts 1 and 2 are not contiguous as required by the strip-and-gore doctrine, we hold that the trial court properly granted summary judgment in Kirby and the Port's favor, and correctly denied THI's motion.

### E. The Grip Affidavit.

■■■ The trial court placed the J.T. Harrell south line during the first part of the bifurcated trial. That line, as is shown clearly in the exhibits attached to the findings of fact and conclusions of law, shows the south line's location and also shows that Tracts 1 and 2 are not contiguous, adjoining tracts. '

During the summary judgment phase, THI claimed that the appellees had introduced a "voodoo" exhibit, which moved the south line by several hundred feet to the north. To prove their point, they attempted to introduce expert evidence via a photogrammetry expert, Wayne Grip, who would have placed the south line in a different location. However, Grip's affidavit would have served only as an attempt to relitigate the location of the J.T. Harrell grant south line. The trial court had already heard extensive expert testimony regarding the location of the south line. It made a finding on that issue and incorporated exhibits depicting where the line lay on the ground. As a result, Grip's affidavit—which served only to refute the placement of that line—was unnecessary and it was within the trial court's discretion to exclude it. *See Vela v. Wagner & Brown, Ltd.,* 203 S.W.3d 37, 52 (Tex.App.-San Antonio 2006, no pet.) (we review a trial

court's decision to admit or exclude expert evidence under and abuse of discretion standard). We overrule appellant's summary judgment issues.

### IV. Conclusion

We overrule THI's issues and affirm the trial court's judgment.