OPINION



No. 04-06-00072-CV



SILVER OIL & GAS, INC.,


Appellant



v.



EOG RESOURCES, INC. and TEMA Oil & Gas Company,


Appellee



From the 63rd Judicial District Court, Val Verde County, Texas


Trial Court No. 22,436


Honorable Thomas F. Lee, Judge Presiding



Opinion by: Alma L. López, Chief Justice


Sitting: Alma L. López, Chief Justice

 Sandee Bryan Marion, Justice

 Phylis J. Speedlin, Justice


Delivered and Filed: November 28, 2007


AFFIRMED IN PART; REVERSED AND REMANDED IN PART

 Silver Oil & Gas, Inc. appeals the trial court's judgment establishing the final boundary line
between Survey 9 and Survey 10, Block Q5, T.C.R.R. Co. Survey. Silver contends that the trial
court erred by: (1) adopting a construction that impermissibly shortens a senior survey; (2) failing
to locate the surveys in question from the nearest established corner; (3) locating the surveys from
an unmarked prairie line; and (4) granting to EOG Resources and TEMA lands that were sold to
Silver's predecessors more than a century ago. (1) EOG Resources filed a cross-appeal asserting that
the trial court erred in failing to award it court costs as the prevailing party. We affirm the trial
court's judgment with regard to the establishment of the final boundary line. We reverse the trial
court's assessment of costs and remand the issue of costs for further proceedings in the trial court.

Background


 The following portion of a survey of the area was attached to the trial court's second
amended final judgment and is included in this opinion for ease of reference:




 Silver was the lessee of an oil and gas lease on Survey 9, Block Q5. Sometime later, EOG
Resources leased Survey 10, Block Q5 and drilled wells. EOG Resources later assigned a portion
of its lease to TEMA. Silver sued EOG Resources and TEMA for numerous causes of action based
on its contention that the wells were located too close to the boundary line between Survey 9, Block
Q5 and Survey 10, Block Q5.

 Surveys 9 and 10 of Block Q5 were surveyed by E.A. Giraud in 1884, together with Surveys
117-1/2 of Block 1 and Surveys 11 and 12 of Block Q5. (2) These five surveys were being located to
fill a gap between preexisting senior surveys in Block 1 (specifically Survey 116) and Block Q6
(specifically Surveys 9, 12, 13 and 14). Therefore, Block 1, Survey 117-1/2, and Block Q5, Surveys
9, 10, 11, and 12, were junior surveys.

 The trial was bifurcated with the issue of the boundary line first being tried before the trial
court. Three surveyors testified at trial with regard to the location of the boundary line. All of the
surveyors agreed that Giraud made an error of 222.45 varas (3) when he re-surveyed Survey 116, Block
1 due to errors in measurements along the Pecos River which served as the western border of Survey
116 (the senior survey to the west of the junior surveys). This error affected the total east-west
distance of the junior surveys, so that the called distances along the southern line of the junior
surveys exceeded the distance actually available between the senior surveys. The surveyors
disagreed regarding the appropriate means to locate the boundary line between Surveys 9 and 10,
Block Q5 in light of the error.

 Silver's surveyor, W.C. Wilson, testified that the boundary line should be determined by
laying out the surveys in the order in which they were surveyed by Giraud, starting at the southwest
corner of Survey 117-1/2, Block 1. All of the surveyors agreed the southwest corner of Survey 117-1/2, Block 1 could be located by a marked monument (a rock with an "X"). Starting at this corner,
Wilson used Giraud's field notes to locate Survey 117-1/2, Block 1 and Survey 9, Block Q5. This
resulted in the boundary line between Surveys 9 and 10, Block Q5 being further east than the line
marked by Giraud and had Survey 10, Block Q5 overlapping into a senior survey, specifically
Surveys 9 and 12, Block Q6.

 A different view supported by EOG Resources' surveyor, Stan Piper, and TEMA's surveyor,
Kenneth Gold, was to measure the boundary line between Surveys 9 and 10, Block Q5 based on the
called distance west from the boundary line between Survey 10, Block Q5 and Surveys 9 and 12,
Block Q6 (the senior survey to the east). Piper and Gold offered various other scenarios for the trial
court to consider, including prorating the total amount of acreage remaining after Giraud's error was
taken into account among the filler surveys.

 The trial with regard to the boundary line was held on March 30, 2003 through April 2, 2003. 
A partial judgment was entered on August 4, 2004. On April 28, 2006, a second amended judgment
was entered. Findings of Fact and Conclusions of Law supporting the second amended judgment
were entered on April 27, 2006.

 The trial court entered the following findings and conclusion relevant to the dispute in
question: (4)


FINDINGS OF FACT



 (1) The land in question is located in the Northwest corner of Val Verde County
as Val Verde County joins the Southwest corner of Crockett County, Texas. The
north and west line of the area that is the subject of this suit is the Pecos River, and
the area extends east from the river several miles.


 (2) The vast western land of the United States required permanently set corners
to be used as anchors for early surveys, and to accomplish this purpose the flag poles
on U.S. Army Forts were used as reference points. Also, the U.S.C. & G.S.
Triangulation stations, Mitchell in Crockett County, and Scott in Terrell County are
now used to locate the area. The system of surveys in this case consist of Block 1,
I&G.N. RR. Co. Survey and Blocks Q5 and Q6, T.C. RR Co. Survey approximately
26 miles south of Fort Lancaster, Texas, with the Pecos River on the north and west
of the surveys.


 (3) The river surveys along the Pecos River were the first sections surveyed in
the area. In the early history of Texas, water frontage was important to encourage
settlement, and the State wanted as many river sections as possible surveyed for
conveyance. A river survey was intended to be roughly two miles long and 1/2 mile
wide and to consist of 640 acres. The river surveys in the area in question were
surveyed first, and are senior surveys.


 (4) The land in question was first surveyed by one Jacob Kuechler in 1877. 
However, the accepted survey for this system was done in 1884 by E.A. Giraud.


 (5) When these early surveys were done, normal "systematic errors" frequently
occurred because of the lack of precision surveying equipment available to early
surveyors, and due to the roughness of the terrain. E.A. Giraud, in surveying the
system, made an error (called a blunder) in the amount of 222.45 varas shortage
along the meanders of the Pecos River between the Northwest corner of Survey 116
and the Northwest corner of Survey 117, Block 1, I.&G.N. RR. Co. ....


 (6) A system of surveys is a set of blocks under one title, surveyed at or near the
same time, as one piece of work. Block 1, I&GN RR Co. is a system of surveys. 
Block Q5, T.C. RR. Co. is a system of surveys. Block Q6, T.C. RR. Co. is a system
of surveys.


 (7) Within a system of surveys, there may be senior surveys and filler surveys. 
The senior surveys (the surveys done with the land was first segregated from the
public domain) in this area are the Block 1 river surveys 106-116 and 117-121. The
filler survey in Block 1 is 117-1/2, and [in] Block Q5 are 9, 10, 11 and 12.


 (8) Survey 117-1/2, Block 1, I.&G.N. RR. Co. was severed from the public
domain on January 15, 1884 by survey and conveyed to James Kirkland in 1884.


 (9) Surveys 117-1/2 in Block 1 and surveys 9, 10, 11 and 12 in Block Q5 are a
"filler system," surveyed under one application, by the same surveyor within a two
day period.


 (10) Block Q5 and Block Q6 were surveyed by William Bonnell and segregated
from the public domain in April, 1882.


 (11) Two established and accepted known corners of the I & G.N. RR. Co. river
surveys are the Northwest corner of 116 which is a rock mound monument and the
Northwest corner of Survey 117, a large embedded rock marked X (the same as the
Southwest corner of Survey 117-1/2) as testified to by the parties and are not in
dispute.


 (12) The Southwest corner of Survey 116, (which Defendants call the El Paso
corner), is found on a large boulder projecting into the Pecos River as a witness
monument. This corner is the corner accepted by surveyor Ken Gold and Stan Piper,
and confirmed to them by the field notes of H.L. George in 1949. This corner is
established and is to be used as the point to conduct the reconstruction of Survey 116.


 (12) [sic] Title to Survey 9 was applied for, surveyed, sold, and patented nearly
thirty years before the survey or purchase of Survey 10.


 (13) The original survey of E.A. Giraud of Survey 116 is in error as between the
Northwest corner and the Southwest corner as it meanders along the Pecos River.


 (14) The shortage in the above error results in a shortage or ambiguity of the
location of the east line of Survey 116.


 (15) Survey 116 is a river survey and is senior to Survey 117-1/2 and Surveys 9
and 10.


CONCLUSIONS OF LAW



 (1) Survey 9 and 10 in Block Q5 are of the same priority.


 (2) The boundary line as established by Giraud between Survey 9 and Survey 10
shall be the final boundary line. (This confines Giraud's error to the area where it
happened, i.e., the Pecos River; and maintains the integrity of the earlier deeds and
chain of title pertaining to Survey 9 and Survey 10).


 Based on these findings and conclusion, the trial court entered its second amended final
judgment, which states:

 The boundary line as established by E. A. Giraud between Survey 9 and Survey 10,
Block Q5, T.C.R.R. Co. Survey shall be he final boundary line. (This confines E. A.
Giraud's error to the area where it happened, i.e., the Pecos River; and maintains the
integrity of the earlier deeds and chain of title pertaining to Survey 9 and Survey 10). 
This boundary line is located by holding E.A. Giraud's call of 2630 varas from the
Q5-Q6 block line, an established boundary line of certainty, for the north and south
boundary lines of Survey 10.


Standard of Review


 The parties disagree on the appropriate standard of review to be applied by this court. Silver
contends that the facts are undisputed; therefore, the location of the boundary line is a question of
law. EOG and TEMA assert that Silver is challenging the trial court's findings based on competing
testimony from various surveyors.

 Texas law is well settled that unless the facts are undisputed, the location of the survey line,
as it was run on the ground by the original surveyor, is a question of fact for the jury. TH
Investments, Inc. v. Kirby Inland Marine, L.P., 218 S.W.3d 173, 203 (Tex. App.--Houston [14th
Dist.] 2007, pet. filed). "The Texas Supreme Court has explained that '[a]s to what are boundaries,
is a question of law for the determination of the court; as to where the boundaries are upon the
ground, is a question of fact to be determined from the evidence.'" TH Investments, Inc., 218
S.W.3d at 203 (quoting Farley v. Deslonde, 58 Tex. 588, 591 (1883)).

 In TH Investments, Inc., the appellant, THI, argued that the choice between legally correct
and legally incorrect surveys was a question of law, citing Brainard v. State, 12 S.W.3d 6, 10 (Tex.
1999). 218 S.W.3d at 203-04. The Houston court distinguished Brainard because the boundary
dispute in Brainard did not arise from competing surveys but because the width of a river had
narrowed from 3400 feet to 20-50 feet. Id. at 204. As the court in Brainard noted, the boundary
dispute in that case did not raise a fact question because it was dealing with conflicting legal theories
with regard to the doctrine of riparian ownership. 12 S.W.3d at 10. In contrast, the Houston court
noted that the dispute with regard to the property line in TH Investments, Inc. required a choice of
which of the competing surveys accurately showed the line as found in the original survey which was
a question of fact. 218 S.W.3d at 204.

 Similarly, in this case, the trial court was required to determine which of the competing
surveys presented at trial accurately showed the location of the disputed boundary line. Although
Silver contends the facts are not in dispute, one fact in dispute that affected the manner in which the
testifying surveyors constructed their surveys was whether a boulder located in the Pecos River was
a witness monument and could be used to locate the Southwest corner of Survey 116. Wilson,
Silver's surveyor, said it was not, while Piper and Gold, the surveyors for EOG and TEMA,
respectively, said that it was. Another fact in dispute is whether the filler surveys are a "system" of
surveys with each having the same priority. Once again, Wilson disagrees with Piper and Gold who
both believe the filler surveys are a system. Given that factual disputes underlie the surveyors'
opinions and that the trial court was required to choose between competing surveys, we hold that the
appropriate standard of review is sufficiency of the evidence.

 When a party attacks the legal sufficiency of an adverse finding on an issue on which that
party has the burden of proof, the party must demonstrate on appeal that the evidence establishes,
as a matter of law, all vital facts in support of the issue. (5) Dow Chemical Co. v. Francis, 46 S.W.3d
237, 241 (Tex. 2001). In reviewing a "matter of law" challenge, the reviewing court must first
examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. 
Id. If there is no evidence to support the finding, the reviewing court will then examine the entire
record to determine if the contrary proposition is established as a matter of law. Id. The point of
error should be sustained only if the contrary proposition is conclusively established. Id.

Discussion


A. Location of the Boundary Line

 In its first three points of error, Silver argues that the trial court's location of the boundary
line was contrary to the following three principles used in locating boundaries: (1) a senior survey
cannot be shortened to accommodate a junior survey; (2) a survey should be located from the nearest
known corner; and (3) courts disfavor giving dispositive effect to open prairie lines. EOG and
TEMA argue that the original surveyor's intent is the cardinal rule used in locating boundary lines
to which all other principles must yield and that Silver failed to establish as a matter of law that the
only proper location for the boundary line was the location proffered by Silver's surveyor.

 When finding the lines of a survey, the cardinal rule is that the footsteps of the original
surveyor, if they can be ascertained, should be followed. TH Investments, Inc., 218 S.W.3d at 204. 
If the actual lines and corners run by the original surveyor can be found, they are controlling, even
if they are inconsistent with the calls and references in that surveyor's field notes. Id. When one can
locate on the ground with certainty and without inconsistency the objects or monuments designated
by the original surveyor as marking the lines he actually traced, the survey must be laid out from
those points. Id. However, if the location of the actual footsteps of the surveyor cannot be
established with reasonable certainty, all the surrounding facts and circumstances should be
considered in order to arrive at the purpose and intent of the surveyor who made the original survey. 
Id. When trying to re-establish a boundary, the law of legal preferences gives dignity to calls in the
following order: (1) natural objects; (2) artificial objects; (3) course; and (4) distance. Id. at 207.

 The description in a senior survey controls when locating a line of that survey over any junior
survey of that line, unless the evidence proves that the senior survey is in error. Id. at 205. 
Although a junior survey cannot be used to create ambiguity in or to change the lines of a senior
survey, it may be used as evidence of the location of the lines of a senior survey. Id.

 In this case, the evidence undisputedly established that Survey 116 contained an error of
approximately 222.45 varas between the Northwest corner of Survey 116 and the Northwest corner
of Survey 117. As a result, Giraud was mistaken with regard to the amount of acreage available for
the filler surveys, and all calls for course and distance along the southern boundary line of Surveys
117-1/2, 9 and 10 were affected. In order to avoid the problems created by the error in the senior
survey to the west (survey 116), the trial court decided to work back from the senior survey to the
east.

 Silver first relies on case law stating the general principle that senior surveys control over
junior surveys, and junior surveys are not to be used to change the boundaries of a senior survey. 
See Kirby Lumber Corp. v. Lindsey, 455 S.W.2d 733, 739 (Tex. 1970); Garcia v. State, 274 S.W.
319, 322 (Tex. Civ. App.--Austin 1925, no writ). In this case, however, Survey 116 is not
controlling because it contains an undisputed error or blunder. TH Investments, Inc., 218 S.W.3d
at 205. If the boundary line of Survey 116 is ultimately moved, an issue that the trial court did not
decide, the movement would not be caused by the junior surveys but by the blunder in Survey 116. 
Giving effect to Giraud's distance calls along the Southern boundary line in view of Giraud's known
blunder in Survey 116 would be at variance with Giraud's intention that the eastern boundary of the
filler surveys would adjoin the western boundary of Q6 - not overlap it. See Garcia v. Garza, 161
S.W.2d 297, 301 (Tex. Civ. App.--San Antonio 1942, writ ref'd w.o.m.) (noting classification and
grades of calls will not be applied to bring about a result at variance with the intention of the original
surveyor in locating the survey). Moreover, the trial court's judgment did not resolve any issue with
regard to the location of the lines in Survey 116; therefore, no junior survey has been used to change
the boundary lines of Survey 116.

 Silver next contends that the trial court should have located the surveys based on the nearest
known corner and, since none of the parties disputed the location of the southwest corner of survey
117-1/2, this corner should have been used to locate the surveys. Silver once again relies on case
law stating the general principle that natural monuments locating corners should be given priority
in locating surveys. See Kirby Lumber Co. v. Adams, 93 S.W.2d 382, 385 (Tex. 1936). In this case,
although the location of the corner is undisputed, the acreage used by Giraud in making the distance
calls for the filler surveys is affected by the blunder in Survey 116. As a result, the certainty of the
location of the corner is not useful in determining the location of the filler surveys. Stated
differently, the general rules of surveying must yield to Giraud's intention for the filler surveys to
adjoin the Q6 line in the east - not overlap it. Great Plains Oil & Gas Co. v. Foundation Oil Co.,
153 S.W.2d 452, 456 (Tex. 1941) (noting rule of construction to construct survey from undisputed
corner is appropriate when locating independent survey (not sections in filler survey) and must yield
to another rule that better enables the court to give effect to parties' intentions).

 Silver further contends that the trial court erred in using the Q6 line to locate the boundary
line because the Q6 line is an open or unmarked prairie line. Silver relies on cases generally stating
the principle that an unmarked prairie line that must be ascertained by running boundaries of another
survey is typically a subordinate means to construct a survey. See Turner v. Smith, 61 S.W.2d 792,
801 (Tex. 1933). Calls for adjoinder, however, prevail even if adjoinder is with an unmarked but
ascertainable line. Frost v. Socony Mobil Oil Co., 433 S.W.2d 387, 396 (Tex. 1968). Although an
exception exists if the call for adjoinder was made "upon misapprehension, mistake or conjecture,"
Turner, 61 S.W.2d at 800, the adjoinder call in this case was not a mistake. Giraud intended for the
surveys to adjoin line Q6 and account for the full amount of the available acreage. Giraud was
simply mistaken as to the amount of available acreage due to his blunder in Survey 116. "[W]hen
the position of an unmarked line is correctly determined and called for in field notes, it ha[s] the
dignity of a call for an artificial object." Leone Plantation, Inc. v. Roach, 187 S.W.2d 674, 682 (Tex.
Civ. App.--Waco 1945, writ ref'd w.o.m.); see also Phillips Petroleum Co. v. State, 63 S.W.2d 737,
745 (Tex. Civ. App.--Austin 1933, writ ref'd). Giraud's clear intent was for the filler surveys to
adjoin the Block Q6 line, and his calls of distance along the north line of the survey accomplished
that purpose. All of the surveyors agree that the Q6 line is an ascertainable line; therefore, the trial 
court did not err in relying on the Q6 line in making its ruling.

 Finally, Silver contends that the trial court's location of the boundary line grants to EOG and
TEMA lands the were previously sold to Silver. Silver relies on evidence that Survey 9 was patented
to Silver's predecessors forty years before Survey 10 was patented to the predecessors of EOG and
TEMA. However, the survey and location of the land determines the rights of the parties, not the
issuance of patents. Allen v. Draper, 254 S.W. 783, 784-85 (Tex. Comm'n App., holding approved),
modified by, 256 S.W. 255 (1923); Ashby v. Ringstaff, 464 S.W.2d 891, 894 (Tex. Civ.
App.--Austin 1971, writ ref'd n.r.e.).

 The testimony of Piper and Gold is sufficient to support the trial court's findings regarding
the proper location of the boundary line between Survey 9 and Survey 10.

B. Cross-Appeal Costs

 In its cross-appeal, EOG claims that the trial court abused its discretion in ordering the costs
were to be borne by the parties incurring the same. EOG asserts that it was a successful party
entitled to recover its costs unless the trial court stated good cause for deviating from the general rule
on the record. See Tex. R. Civ. P. 131, 141. 

 Rule 131 requires the trial court to order that the winning party recover its costs from the
losing party, allowing a trial court to order otherwise only for good cause to be stated on the record. 
Furr's Supermarkets, Inc. v. Bethune, 53 S.W.3d 375, 376 (Tex. 2001). Rule 141 has two
requirements - that there be good cause for contravening Rule 131 and that it be stated on the record. 
Id. A trial court abuses its discretion when it allots costs contrary to the provisions of Rule 131
without including in the record an explanation for the allotment. Texas River Barges v. City of San
Antonio, 21 S.W.3d 347, 358 (Tex. App.--San Antonio 2000, pet. denied).

 Silver argues that the trial court could have found good cause because the final boundary line
located by the trial court still establishes that EOG had drilled a well in violation of the spacing
requirements. Silver further asserts that if we reverse the trial court with regard to costs, a remand
of the proceeding for further consideration of the costs issue would be appropriate. EOG prays that
we modify the judgment to award it costs.

 The judgment does not state good cause for ordering costs assessed against the parties who
incurred them; however, the trial court arguably had good cause for having done so. In addition to
a well being illegally located based on the trial court's determination of the final boundary line, the
trial court rejected many theories for the location of the boundary line put forth by EOG, including
the theory of proration. The trial court may have determined that the presentation of the proration
theory which had been rejected by the General Land Office unnecessarily prolonged the proceedings. 
See Furr's Supermarkets, Inc., 53 S.W.3d at 377 (good cause includes unnecessarily prolonging the
proceedings or increasing costs). Although this court has modified a judgment when good cause was
not stated on the record, see Texas River Barges, 21 S.W.3d at 358, this court has also remanded the
cause when an argument supporting the existence of good cause was made on appeal. Price Const.,
Inc. v. Castillo, 147 S.W.3d 431, 443 (Tex. App.--San Antonio 2004), pet. denied, 209 S.W.3d 90
(Tex. 2005); see also Clovis Corp. v. Lubbock Nat'l Bank, 194 S.W.3d 716, 720-21 (Tex.
App.--Amarillo 2006, no pet.) (remanding issue of costs for further proceedings). Under the
circumstances presented, we believe the most appropriate resolution is to reverse the trial court's
judgment with regard to the assessment of costs and remand the cause to the trial court for further
proceedings on the costs issue.

Conclusion


 The portion of the trial court's judgment ordering that costs be assessed against the parties
incurring same is reversed, and the cause is remanded to the trial court for further proceedings on
that issue. The remainder of the trial court's judgment is affirmed.


 Alma L. López, Chief Justice


1. Because we affirm the trial court's judgment with regard to the location of the final boundary line, we do not
address the conditional cross-point raised by EOG Resources and TEMA.
2. Survey 12, Block Q5 is located immediately south of Survey 11, Block Q5 but is not depicted on the map.
3. A vara is a measure of length equal to about 33 inches. Black's Law Dictionary 1588 (8th ed. 2004).
4. Silver also initially challenged a second boundary line at trial that is not an issue in this appeal.
5. Because Silver requests that we render judgment in its favor, its argument must be construed as a challenge
to the legal sufficiency of the evidence. See Selectouch Corp. v. Perfect Starch, Inc., 111 S.W.3d 830, 835 (Tex.
App.--Dallas 2003, no pet.) (noting rendition only available for legal sufficiency challenges).