

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-13-00605-CV

**KING RANCH, INC.**,
Appellant

v.

Juan Antonio **GARCIA**, Gonzalo Chapa, Jr., and Carmen S. Chapa,
Appellees

From the 79th Judicial District Court, Jim Wells County, Texas
Trial Court No. 12-11-51704-CV
Honorable Richard C. Terrell, Judge Presiding

Opinion by:     Catherine Stone, Chief Justice

Sitting:        Catherine Stone, Chief Justice
                Marialyn Barnard, Justice
                Luz Elena D. Chapa, Justice (concurring in the judgment only)[1]

Delivered and Filed:  September 17, 2014

REVERSED AND RENDERED

Appellees' motion for rehearing is denied. This court's opinion and judgment dated

August 6, 2014 are withdrawn, and this opinion and judgment are substituted. We substitute this

opinion to clarify our conclusion regarding the location of the boundary line.

This appeal arises from a dispute over a boundary line established in an 1891 Deed of

Exchange between Henrietta M. King, predecessor-in-interest to appellant King Ranch, Inc., and

Luciano Garcia, et al., predecessors-in-interest to appellees Juan Antonio Garcia, Gonzalo Chapa,

---

[1] Justice Chapa would vote to request a response to the motion for rehearing.

Jr., and Carmen S. Chapa (the "Garcias"). King Ranch contends that the boundary line is a straight line north of an existing fence, while the Garcias contend the existing fence line is the boundary line. The boundary line not only separates the parties' land, but also serves as a portion of the boundary line between Jim Wells County and Kleberg County. King Ranch challenges the legal and factual sufficiency of the evidence to support the trial court's finding that the existing fence line is the boundary line and its alternative findings that the Garcias adversely possessed the land located north of the fence. We reverse the trial court's judgment and render judgment that the boundary line is a straight line.

## BACKGROUND

The following diagram illustrates the parties' positions, with King Ranch's position depicted by the straight line and the Garcias' position depicted by the curved fence line.



The dispute between the parties arose when King Ranch had the boundary line between the properties surveyed to install a new fence. Ronald Brister, who prepared the survey, opined that the boundary line was a straight line north of the existing fence. The Garcias filed the underlying lawsuit to prevent King Ranch from replacing the existing fence. During the subsequent trial, the Garcias' expert, David Nesbitt, testified that the boundary line followed the existing fence line. In addition to Brister's testimony, King Ranch also called Nelda Foster, another surveyor, as a witness, and she also testified that the boundary line was a straight line.

After considering the competing experts' opinions, the trial court agreed with Nesbitt, finding that the existing fence line was the boundary line. The trial court alternatively found that the Garcias adversely possessed the land north of the fence. King Ranch appeals.

### STANDARD OF REVIEW

When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue for which it did not have the burden of proof, the party must show that no evidence supports the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). "Evidence is legally sufficient if it 'would enable reasonable and fair-minded people to reach the verdict under review.'" *Id.* (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). "We 'credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.'" *Id.* "A factual sufficiency attack on an issue on which the appellant did not have the burden of proof requires the complaining party to demonstrate there is insufficient evidence to support the adverse finding." *Flying J Inc. v. Meda, Inc.*, 373 S.W.3d 680, 690-91 (Tex. App.—San Antonio 2012, no pet.). "A reviewing court will reverse the trial court only if the evidence which supports the jury's finding is so weak as to be clearly wrong and manifestly unjust." *Id.*at 691 (internal citations omitted). "We may not substitute our judgment for that of the trier of fact or pass on the credibility of the witnesses." *Sunl Group, Inc.*

*v. Zhejiang Yongkang Top Imp. & Exp. Co., Ltd.*, 394 S.W.3d 812, 817 (Tex. App.—Dallas 2013, no pet.).

### LOCATION OF BOUNDARY LINE

"When finding the lines of a survey, the cardinal rule is that the footsteps of the original surveyor, if they can be ascertained, should be followed." *Silver Oil & Gas, Inc. v. EOG Resources, Inc.*, 246 S.W.3d 197, 204 (Tex. App.—San Antonio 2007, no pet.) (citing *TH Investments, Inc. v. Kirby Inland Marine, L.P.*, 218 S.W.3d 173, 204 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)). "If the actual lines and corners run by the original surveyor can be found, they are controlling, even if they are inconsistent with the calls and references in that surveyor's field notes." *Id*. "When one can locate on the ground with certainty and without inconsistency the objects or monuments designated by the original surveyor as marking the lines he actually traced, the survey must be laid out from those points." *Id*. "However, if the location of the actual footsteps of the surveyor cannot be established with reasonable certainty, all the surrounding facts and circumstances should be considered in order to arrive at the purpose and intent of the surveyor who made the original survey." *Id*. "When trying to re-establish a boundary, the law of legal preferences gives dignity to calls in the following order: (1) natural objects; (2) artificial objects; (3) course; and (4) distance." *Id*.

A.     Undisputed Facts

The following facts are undisputed:

(1) the 1891 Exchange Deed called for a straight boundary line, conveying to the Garcias the land "lying north of a line commencing at a point 217.4 vrs [varas] south from the north east corner of Section No. 63 and **running thence east** until it intersects the east boundary line of section No. 257…."

(2) C.E. Haberer was the county surveyor for Jim Wells County and originally surveyed the boundary line in 1911 while surveying the east boundary of Jim Wells County. Haberer started his 1911 survey in the southern-most southeast

corner of Jim Wells County at a monument which still stands[2] and traveled north setting one mile posts until reaching the corner that serves as the northwest corner of Kleberg County.  At that corner, Haberer turned east, calling "**Thence N 89º48' E with south line of Luciano Garcia and others, and north line of Mrs. H.M. King pasture**" and setting one mile posts until he placed a second original monument which all of the experts agree is located at the northern-most southeast corner of Jim Wells County which adjoins Jim Wells County, Nueces County, and Kleberg County.[3]  The monument at the corner that serves as the northwest corner of Kleberg County was not located, nor were the original one mile posts.

(3) C.F.H.v. Blucher was the county surveyor for Nueces County, and, in 1913, Blucher retraced the boundary lines surveyed by Haberer.[4]  Blucher started his 1913 survey at the Haberer Monument and followed Haberer's one mile posts north to the northwest corner of Kleberg County.  At that corner, Blucher turned east, calling "**Thence N. N 89º48' E, with the Northern boundary line of said Jim Wells County**" and following Haberer's one mile posts until he reached another original monument which Blucher replaced because it was decaying.[5]

All of the surveyors agreed that these three documents call for a straight boundary line.  All of the surveyors and the parties also agree on the location of the western end of the boundary line between the parties which is depicted on the diagram as Agreed Point C.

B.      Surveyors' Positions

Nesbitt, who testified in favor of the Garcias' position, started his survey at the Blucher Monument.  Nesbitt then measured the called distances to the west to reach the western end of the boundary line at Agreed Point C.

Brister and Foster, who testified in favor of King Ranch's position, started their surveys at the Haberer Monument, which is the same corner at which Haberer and Blucher started.  Because the monument at the northwest corner of Kleberg County could not be located, Brister: (1) measured the called distance north from the Haberer Monument; (2) measured the called distance

---

[2] This monument is labeled on the diagram as the Haberer Monument.
[3] This monument is labeled on the diagram as the Blucher Monument.
[4] Blucher was surveying the boundary lines of Kleberg County after legislation was passed creating Kleberg County out of part of Nueces County.
[5] This monument is labeled on the diagram as the Blucher Monument.

west from the Blucher Monument; and (3) determined that the northwest corner of Kleberg County was where the lines intersected.[6]

C.      Application of General Legal Surveying Principles to Surveyors' Positions

1.      Following the Footsteps of the Original Surveyor

All of the surveyors worked from the Blucher Monument; however, Brister and Foster also worked from the Haberer Monument and started at the corner at which Haberer and Blucher started.   Therefore, Brister and Foster more closely followed the cardinal rule to follow the footsteps of the original surveyor.  *Silver Oil & Gas, Inc.*, 246 S.W.3d at 204; *see also Kirby Lumber Co. v. Adams*, 93 S.W.2d 382, 385 (Tex. 1936) ("We do call attention, however, to the rule of law to the effect that where the natural and artificial objects of the grant cannot be identified upon the ground, the proper method of locating the lines and corners will be by course and distance from the nearest recognized and established corner or artificial object with which the field-notes are connected."); *City of Houston v. Savely*, 708 S.W.2d 879, 887 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) ("Where a survey may be plotted on the ground from an established corner called for in its field notes, which are not ambiguous, as a matter of law it must be so constructed on the ground.").

2.      Presumption in Favor of Surveyor's Field Notes

Brister and Foster followed a single called bearing east consistent with the 1891 Exchange Deed and the 1911 and 1913 surveys.  By following the existing fence line, Nesbitt's boundary line results in 9 bearing and course calls off a straight line.  In doing so, Nesbitt used the fence as a monument.  In this case, neither Haberer's nor Blucher's field notes describe a fence. Haberer's sketch of the county line, however, shows a fence in the location.

---

[6] Brister's calculations located the northwest corner at 72.2 varas west of the corner of survey 64 which matches the call in Haberer's field notes from the northwest corner to the corner of survey 64.

With regard to the single called bearing, the law presumes that the surveyor "constructed his surveys and ran his course and distance as called for by him in his field notes." *Strayhorn v. Jones*, 300 S.W.2d 623, 629 (Tex. 1957); *see also Hurr v. Hildebrand*, 388 S.W.3d 284, 288 (Tex. Civ. App.—Houston 1965, writ ref'd n.r.e.). "Unless later surveyors can, by following the original surveyor['s] footsteps, show that the original surveyor's calls are a mistake and incorrect, the survey must be constructed as called for by the original surveyor." *Strayhorn*, 300 S.W.2d at 630.

The "general rule of boundary law" is "that the location of lines or corners of a survey may not be established or controlled by artificial objects or marks not called for in the field notes." *See Gill v. Peterson*, 86 S.W.2d 629, 631 (Tex. 1935). "[A] mark or [artificial] object is of no probative value if the field notes or grant contain no description of it or no reference to it and there is no evidence directly connecting it with the work of the original surveyor." *Id*. In this case, however, the sketch "connect[s] satisfactorily the mark or object [i.e., the fence] with the survey as originally made." *Id*.

Since the sketch connects the fence with Haberer's survey, the question then becomes whether the fence in the sketch rebuts the presumption that Haberer followed the single called bearing. Nesbitt did not testify that the straight line call was a mistake or incorrect. He just believed that Haberer followed the fence because Haberer diagrammed the fence in his sketch and nothing else would have guided Haberer along the line between the two properties.[7] Foster testified that if Haberer had followed the fence, his field notes would have stated that he had done so. Moreover, although the sketch contains a series of x's indicating a fence was in the location of the boundary line, the sketch still shows the boundary line at this location as a straight line.

---

[7] Nesbitt testified that Haberer did not have the technology to follow a straight line for seven and one-half miles; however, both Brister and Foster disagreed. Notwithstanding Nesbitt's testimony that technology would not have enabled Haberer to follow a straight line for seven and one-half miles, Nesbitt's field notes call for a straight line from the end of the fence to the Blucher Monument which was a distance of approximately four miles.

Absent evidence that the single called bearing was a mistake, the presumption that Haberer ran his survey in accordance with his course and distance calls controls.

        3.      Erroneous Use of Junior Surveys

Nesbitt used posts and iron rods placed in connection with junior partition surveys as additional evidence of the boundary line along the fence. "The description in a senior survey controls when locating a line of that survey over any junior survey of that line, **unless the evidence proves that the senior survey is in error**." *Silver Oil & Gas, Inc.*, 246 S.W.3d at 204 (emphasis in original). "[A] junior survey cannot be used to create ambiguity in or to change the lines of a senior survey." In this case, the junior survey markings contradict the straight line called in Haberer's and Blucher's senior surveys.

D.      Conclusion

Because the Brister/Foster surveys are consistent with the general legal principles governing surveys and the presumption that Haberer ran his survey in accordance with his course and distance calls controls, we hold that the evidence supports only one finding: the boundary line is a straight line. "[M]onuments fix the actual location of [a] line on the ground for they represent the footsteps of the surveyor and are to be accepted as controlling of calls for course and distance." *Wheeler v. Stanolind Oil & Gas Co.*, 252 S.W.2d 149, 151 (Tex. 1952); *see also Howland v. Hough*, 570 S.W.2d 876, 882 (Tex. 1978) ("It is an established rule that the footsteps of the surveyor shall, if possible, be followed, and natural or artificial monuments are to be accepted as controlling over calls for course and distance."); *Silver Oil & Gas, Inc.*, 246 S.W.3d at 204 ("When one can locate on the ground with certainty and without inconsistency the objects or monuments designated by the original surveyor as marking the lines he actually traced, the survey must be laid out from those points."). In this case, the actual location of the straight boundary line is determined by the Blucher Monument and the Agreed Point C.

### ESTOPPEL BY DEED

The trial court concluded that the 1891 Deed of Exchange estopped King Ranch from denying the Garcias' title to the land north of the fence line which the trial court determined to be the boundary line.

"Estoppel by deed prevents a party from claiming a position inconsistent with a grant and precludes parties to a valid instrument from denying its full force and effect by binding them to the recitals, reservations, and exceptions in the deed." *Bradshaw v. Steadfast Financial, L.L.C.*, 395 S.W.3d 348, 371 (Tex. App.—Fort Worth 2013, pet. filed). This theory does not, however, apply in this case. "The effect of the doctrine [of estoppel by deed] is to prevent a party to a deed from denying the truth of the recitals in a valid deed." *Masgas v. Anderson*, 310 S.W.3d 567, 571 (Tex. App.—Eastland 2010, pet. denied). This case involves interpreting the 1891 Deed of Exchange and two subsequent surveys to determine the location of the boundary line at the time of the conveyance. King Ranch is not attempting to invalidate the conveyance or deny the truth of the recitals in the deed; instead, King Ranch is seeking to clarify the property that was conveyed. *See Glover v. Union Pacific R. Co.*, 187 S.W.3d 201, 216 (Tex. App.—Texarkana 2006, pet. denied) (noting "deed must be clear and unambiguous in order for estoppel by deed to apply").

Moreover, all of the surveyors agree that the 1891 Deed of Exchange called for a straight line. Thus, the boundary line advocated by King Ranch is consistent with the recitals in the deed, and King Ranch is not "denying the truth of the recitals" in the deed. *Masgas*, 310 S.W.3d at 571.

### ADVERSE POSSESSION

Because we have determined that the boundary line is a straight line, we must also address the trial court's finding that the Garcias had adversely possessed the land north of the fence line under the three, five, ten, and twenty-five-year statutes of limitations.

Juan Antonio Garcia testified that the fence was in existence prior to his possession of his property, and he did not know the purpose for which the fence was constructed. He further testified that he had used the property for Easter parties, grazing cattle, planting hay, and hunting. Finally, he testified that he had not moved a deer blind located by the fence in response to a request by the King Ranch.

Gonzolo Chapa also testified that the fence was in existence prior to his possession of his property and he did not know the purpose for which the fence was constructed. He testified that he had used the land for grazing and hunting.

Carmen Saenz Chapa similarly testified that the fence was in existence prior to her possession of her property and she did not know the purpose for which the fence was constructed. She testified that she had used her property for hunting and grazing cattle and had also planted some crops.

"Under Texas law, adverse possession requires 'an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person.'" *BP America Prod. Co. v. Marshall*, 342 S.W.3d 59, 69 (Tex. 2011) (quoting TEX. CIV. PRAC. & REM. CODE § 16.021(1)). "The statute requires visible appropriation; mistaken beliefs about ownership do not transfer title until someone acts on them." *Id*. "The statute also requires that the possession be inconsistent with and hostile to the claims of all others." *Id*. at 70. "The possession must be of such character as to indicate *unmistakably* an assertion of a claim of exclusive ownership in the occupant." *Id.* (internal citations omitted) (emphasis in original).

"Under the applicable case law, there are two kinds of fences: 'casual fences' and fences that 'designedly enclose' an area." *Rhodes v. Cahill*, 802 S.W.2d 643, 646 (Tex. 1990). "If the fence existed before the [person claiming adverse possession] took possession of the land and the

- 10 -

claimant fails to demonstrate the purpose for which it was erected, then the fence is a 'casual fence.'" *Id*. "Repairing or maintaining a casual fence, even for the express purpose of keeping the claimant's animals within the enclosed area, generally does not change a casual fence into a designed enclosure." *Id*. "A claimant may so change the character of a casual fence that it becomes a designed enclosure, and evidence of such a substantial modification is sufficient to support a jury finding of adverse possession." *Id*.

In this case, the fence was in existence before the Garcias took possession of the land, and no evidence was introduced to demonstrate the purpose for which is was erected. Accordingly, the fence was a casual fence, and no evidence was introduced to show substantial modifications to the fence by the Garcias. As a result, the evidence that the Garcias had family gatherings, grazed and hunted, and occasionally grew crops on the land north of the fence does not establish actual and visible appropriation as required for all adverse possession claims. *Id*. (holding grazing of cattle and goats insufficient evidence of adverse possession); *see also Mendoza v. Ramirez*, 336 S.W.3d 321, 329 (Tex. App.—El Paso 2010, pet. denied) (holding no adverse possession shown by family gatherings on property separated by casual fence); *Moore v. Stone*, 255 S.W.3d 284, 289 (Tex. App.—Waco 2008, pet. denied) (holding no adverse possession of property enclosed by casual fence where only use was grazing and cutting hay and sporadic cultivation); *Harlow v. Giles*, 132 S.W.3d 641, 648 (Tex. App.—Eastland 2004, pet. denied) (holding occasional use of property for hunting purposes, including the construction of deer blinds and deer feeders, insufficient to establish adverse possession). Accordingly, the evidence is legally insufficient to support the trial court's findings on Garcias' adverse possession claims.

## CONCLUSION

Applying the general legal principles of survey law, we hold that the evidence supports only one finding: the boundary line is a straight line, and the actual location of the straight

boundary line is determined by the Blucher Monument and the Agreed Point C. We further hold that the trial court erred in concluding that King Ranch was estopped by the 1891 Deed of Exchange, and the evidence is legally insufficient to support the trial court's findings on the Garcias' adverse possession claims. Accordingly, we reverse the trial court's judgment and render judgment that the boundary line between the properties is a straight line, and King Ranch owns the property south of the boundary line.

Catherine Stone, Chief Justice